## IN RE McCUE.

(No. 6,129.)

(Submitted September 24, 1927.　Decided November 22, 1927.)

[261 Pac. 341.]

*Attorney and Client—Disbarment — Evidence—Insufficiency— Weight to be Given to Findings of Referee.*

Attorney and Client—Disbarment—Findings of Referee—When Conclusive.
　1.　Where the supreme court refers a disbarment proceeding to a referee with directions to report his findings and conclusions of law, his report stands upon the same footing as the findings of the district court or the special verdict of a jury; not to be disturbed by the appointing court if supported by substantial testimony, his conclusions of law being dependent, however, on their soundness in law and the sufficiency of the findings and evidence to support them.

Same—Attorney Charged With Conversion of Client's Money—Showing Held Insufficient.
　2.　*Held,* under the above rule that the finding of the referee that the accused attorney had converted money collected for a client was not supported by the evidence, in view of his uncontradicted testimony that owing to other pressing business engagements which necessitated his absence from the state, leaving his office affairs in the hands of another person and resulting in his forgetting to make timely remittance, cannot be interfered with.

Same — Withholding Client's Money — Absence of Wrongful Intent— Effect.
　3.　The gist of the offense of a charge against an attorney of withholding money collected for a client is the wrongful intent to convert it to his own use, and where it appears that the withholding was not accompanied by such an intent, disbarment cannot follow.

Same—What Sufficient to Show Guilt on Charge of Wrongful Withholding Client's Money.
　4.　Under subdivision 2 of section 8961, providing that an attorney may be disbarred for "violation of the oath taken by him,

---

　1.　Conclusiveness and weight of findings of fact by master, see note in 19 **Ann. Cas.** 908. See, also, 2 **R. C. L.** 210, 1109; 23 **R. C. L.** 299.
　2.　Matters of defense or mitigation in proceedings to disbar attorney for failure to account for money of client, see note in 43 **A. L. R.** 65, 72. See, also, 2 **R. C. L.** 1096.
　3.　Necessity of bad or fraudulent motive to justify disbarment, see note in 18 **L. R. A.** 401. See, also, 2 **R. C. L.** 1096.
　4.　Wrongful retention of money as ground for disbarment, see note in 17 **Ann. Cas.** 692. See, also, 2 **R. C. L.** 1095. Withholding client's money or property as ground for disbarment, see note in 19 **L. R. A.** (n. s.) 414. Disbarment for failure to account for money of client, see note in 43 **A. L. R.** 54.

[80 Mont. 537.]

or of his duties as such attorney," an attorney may be punished for a wilful omission to remit money collected by him as such, even though he did not practice deceit and frankly admits his delinquency.

Same—Perjury—Evidence—Insufficiency.

5. Where the testimony of an attorney, charged with perjury, that at the time he gave certain testimony he did not know the statement made was false but firmly believed it to be true, giving plausible reasons for the statement, the finding of the referee, in view of the favorable position occupied by him in seeing the witness and hearing him testify, that the charge was not supported by the evidence, cannot be said on review to have been erroneous.

Same—Issuing Worthless Checks—Evidence—Insufficiency.

6. Held, that the charge of grand larceny against an attorney committed in issuing worthless checks, claimed by him to have been given without consideration, while intoxicated and to enable him to engage in a gambling game, was not supported by the evidence, as found by the referee.

Same—Improper Actions of Attorney not Supported by Charge Insufficient to Disbar.

7. Where the evidence relating to a charge against an attorney of having failed to remit a collection to his client showed that the accused was not at fault but that the matter had been handled by another person in his office, but that nevertheless the attorney after institution of proceedings against him paid the claim with the condition attached that the complainant should not aid in prosecuting the charge, with the result that such complainant refused to furnish evidence, thus rendering the conduct of both reprehensible as compounding a crime, an offense, however, not charged against the attorney, the finding of the referee that the charge as made was unsupported by the evidence must be upheld.

Same—Attorney not Subject to Disbarment for Vices not Affecting Personal or Professional Integrity.

8. Since complaints against attorneys may be prosecuted only for causes specified by section 8961, Revised Codes 1921, where specific charges under that section are made and none of them present the question of general moral delinquency other than such as may be included under subdivision 5, "being guilty of deceit, malpractice, crime or misdemeanor involving moral turpitude," the court is confined to the specifications made against him, upon which he was tried, and cannot punish him for vices affecting to some extent his moral character, but not his personal or professional integrity.

(MR. CHIEF JUSTICE CALLAWAY and MR. JUSTICE MYERS Dissenting.)

---

[1]    Attorney and Client, 6 C. J., sec. 81, p. 609, n. 9.   References, 34 Cyc., p. 791, n. 25, p. 810, n. 53, p. 853, n. 41.   Witnesses, 40 Cyc., p. 2555, n. 37.

[2]    Attorney and Client, 6 C. J., sec. 50, p. 593, n. 72 New; sec. 62, p. 601, n. 91; sec. 81, p. 609, n. 9.

[3]    Attorney and Client, 6 C. J., sec. 50, p. 592, n. 71.

[4]    Attorney and Client, 6 C. J., sec. 50, p. 591, n. 69; sec. 220, p. 693, n. 82.

[5]    Attorney and Client, 6 C. J., sec. 81, p. 609, n. 9.   Perjury, 30 Cyc., p. 1403, n. 23.

Disbarment proceeding against T. F. McCue. Proceeding dismissed.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State; *Mr. Choate* argued the cause orally.

*Mr. W. F. O'Leary,* for Accused, argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On July 17, 1926, by the judgment of this court, the name of T. F. McCue, an attorney theretofore duly licensed to practice law in this state, was stricken from the roll of attorneys and he was forever disbarred. (*In re McCue,* 77 Mont. 47, 248 Pac. 187.)

The record on which the above-mentioned judgment was rendered shows that McCue had due notice of the proceeding for his disbarment, and appeared and answered the original complaint against him; however, an amended complaint was filed and the accused failed to answer and his default was duly entered. E. K. Cheadle, of Lewistown, a former district judge of this state, was duly appointed referee to hear the matter at Great Falls, where the accused had resided and practiced for a number of years, and, in due time, a hearing was had on the charges preferred against McCue. The accused, then absent from the state, was not represented at the hearing.

Early in April, 1927, McCue returned to Montana and, on a showing of excusable neglect and lack of notice, the above-mentioned judgment was set aside and McCue permitted to file his tendered answer to the amended complaint. The matter

[6]　Attorney and Client, 6 C. J., sec. 77, p. 607, n. 90.
[7]　Attorney and Client, 6 C. J., sec. 69, p. 605, n. 51. Evidence, 23 C. J., sec. 1793, p. 51, n. 67.
[8]　Attorney and Client, 6 C. J., sec. 41, p. 584, n. 1; sec. 69, p. 605, n. 51.

was reset for hearing before Judge Cheadle on issue joined on each specification contained in the amended complaint, and later the attorney general was permitted to add thereto a fifth specification, which was duly denied by the accused.

The matter was regularly brought on for hearing on June 11, 1927, and, by stipulation, all of the testimony introduced on the first hearing was considered as given on the second hearing, supplemented by further depositions and oral testimony on behalf of both the state and the accused.

On July 11, 1927, the referee filed in this court his report of his findings of fact on each of the specifications on which testimony was introduced, his conclusions therefrom, and his recommendation that the proceeding be dismissed, as on no one of the charges made had sufficient evidence been produced to warrant the disbarment of the accused. Counsel for the accused has moved the adoption of the report; the attorney general has moved its rejection on the ground that the findings of the referee are contrary to the law and the evidence.

Before entering upon a discussion of the testimony adduced and the findings of fact and conclusions thereon made and reported by the referee, it is necessary for us to determine and declare the position which such an officer of the court occupies toward the court, and the court's power and authority with reference to the findings of fact and the conclusions of law reported to it by the referee, when requested to reject the report of the referee and to make findings and render judgment contrary to the report and recommendation of the referee.

1. While this court has original jurisdiction of disbarment [1] proceedings (secs. 8951, 8952 and 8961, Rev. Codes 1921), for the convenience of witnesses and of the court it is customary to refer such matters to some attorney of known ability and integrity, usually residing at some distance from the scene of the alleged improper activity of the accused, for a hearing in the community in which the accused resides and the

wrongful conduct is alleged to have been committed. This procedure is authorized by section 8954, Revised Codes of 1921, and its effect defined by sections 9374 to 9385, Revised Codes of 1921.

During a hearing on reference, the referee occupies substantially the position, exercises the power, and discharges the duties, of a trial judge sitting without a jury (sec. 9379); he must report to the court in writing, stating his findings of fact and conclusions of law separately (sec. 9383) in the same manner as does a judge (sec. 9367), and "the findings of the referee upon the issues must stand as the findings of the court, and upon filing of the findings with the clerk of the court, judgment may be entered thereon in the same manner as if the action had been tried by the court" (sec. 9384); they may be excepted to and reviewed in like manner as if made by the court, and when the referee is to report the facts, the findings reported have the effect of a special verdict (sec. 9385).

It would seem from the foregoing provisions that the people of this state, through their representatives, intended to place the findings of a referee in the same category as the findings of a trial court or the special verdict of a jury, and require the challenge to their correctness to be in form of exceptions taken thereto, and a review thereof "in like manner as if made by the court," rather than by motion to reject the findings. The word "review," as used in this connection, means "a judicial re-examination, as of the proceedings of a lower court by a higher" (Webster's International Dictionary); "a second examination of a matter" (3 Bouvier's Law Dictionary, p. 2954), as on appeal (*First Nat. Bank* v. *Heath,* 58 Mont. 337, 352, 192 Pac. 1108).

It is, therefore, apparent that the legislature, in authorizing courts to refer matters, intended that the referee be vested with the dignity and authority of the court in the special instance, rather than that he occupy the position of a mere clerical agent of the court, as is the case where a notary public

is commissioned to take the deposition of a witness. The reason for placing a referee in the position of a trier of facts becomes apparent when we consider that the credibility of witnesses and the weight to be given to their testimony does not depend alone upon the statements made by them; the trier of facts may also take into consideration the appearance and conduct of the witness on the stand and the manner in which he testifies, his interest or bias shown by his testimony, or his conduct and the inherent probability or improbability of his statements, and from all of these matters determine whether or not he has testified truthfully; on the cold record this cannot be done.

Independent of the foregoing provisions binding in this state, it is held in many jurisdictions, including federal courts, that the findings of such a referee, the findings of a master in chancery, the findings of a judge sitting as a jury, and the verdict of a jury in a civil case stand on the same footing; while in other jurisdictions it is held that the findings of a master in chancery analogous to those of a referee, are not entitled to the same weight as a verdict of a jury (see note to *Carr* v. *Fair*, found in 19 Ann. Cas. 908 [92 Ark. 359, 122 S. W. 659]), but in the latter class of cases it is further held that where the master or referee hears evidence and observes the demeanor of the witnesses on the stand, and thus occupies a more advantageous position than does the court, additional weight should be given to the findings (*Fairbury Union etc. Board* v. *Holly*, 169 Ill. 9, 48 N. E. 149), and again it is held in those jurisdictions that where the findings are based upon conflicting testimony, additional weight is lent to the report by reason of the master's or referee's superior opportunity for judging the intelligence and candor of the witnesses (19 Ann. Cas., at page 913). At page 911 of the note above referred to it is said that: ''The most general expression as to the weight to be given to the master's findings of fact is that they should be sustained unless there manifestly, palpably, or clearly ap-

pears to have been error or mistake upon his part" (citing a large number of United States and state cases).

There seems, therefore, to be little divergence between the two rules; but whatever the rule elsewhere, we seem to be committed to the rule that, in hearing on disbarment proceedings, the report of the referee stands on exactly the same footing as the findings of a court or the verdict of a jury.. (*In re Lunke*, 56 Mont. 226, 182 Pac. 126; *In re Sullivan*, 57 Mont. 592, 189 Pac. 770; *In re Griggs*, 74 Mont. 373, 240 Pac. 820.) In the *Griggs Case* it is said: "As to this it must be admitted by all that the referee occupied a position of advantage which the members of this court, sitting in review, do not occupy. He saw the witnesses on the stand, heard their voices, and observed their appearance and demeanor. He was much better qualified than are we to give the testimony of these witnesses the weight to which it is entitled. (*In re Parsons*, 35 Mont. 478, 90 Pac. 163; *In re Ryan*, 46 Mont. 289, 127 Pac. 904.) In view of the fact that the record discloses the referee's findings are supported by substantial testimony, coupled with an appreciation of the advantageous position he occupied as a trier of the facts, we shall not interfere with his conclusions."

In the Lunke opinion, Mr. Justice Holloway, speaking for the court, said: "While the findings of a referee are not absolutely conclusive, they are to be given the same dignity as the special verdict of a jury or the findings of a trial court, and whenever they depend upon conflicting testimony, they will be treated as unassailable if there is any substantial evidence to sustain them."

In the *Ryan Case*, the syllabus prepared by the court states that "the rule that the supreme court will not interfere with findings of the district court based upon conflicting evidence applies in the case of findings made by a referee," although the opinion is couched in the language quoted from the *Griggs Case* above.

2. The conclusions of law reported by the referee must, of course, if they are to be upheld, stand on their soundness in

law and the sufficiency of the findings and evidence to uphold them.

Bearing in mind the above rules, we will canvass the evidence adduced to determine whether it supports the findings of fact reported by the referee and his conclusions drawn therefrom, with respect to the several specifications of charges contained in the complaint on which the accused was tried, of which there were four in the original complaint and an additional one in the final amended complaint, but on which the accused was called upon to defend only as to four charges, specification numbered 3 having been withdrawn by the attorney general before the commencement of the hearing.

3. The first specification charged that in November, 1923, [2] one H. A. Burns placed in the hands of the accused, for collection, a claim against the Gordon Campbell Petroleum Company in the sum of $1,050 and remitted to him the sum of $15 to cover costs of suit; that he collected $600 thereof "during the summer of 1924" and failed and neglected to remit the same, "though repeated demands were made upon him" therefor.

The answer filed by the accused on November 11, 1925, denied that H. A. Burns had ever employed him for any purpose, but alleged that the claim was received from Mrs. M. J. Burns, that he had fully accounted to her for all moneys collected, and that she was fully satisfied. The attorney general thereafter ascertained that on November 4, 1925, after learning of the charges against him, McCue had remitted to Mrs. Burns the sum of $377.20; he thereupon amended the complaint to charge that the amount had been remitted at that time, and that McCue had converted the balance, or $312, to his own use. In the former opinion (*In re McCue,* above) it is pointed out that the gravemen of this specification was not narrowed by the amendment. That this is true is beyond cavil; if guilty, the accused could no more purge himself of guilt by such action than could one accused of grand larceny of a horse

purge himself of guilt after information filed by the return of the horse.

On the first hearing the referee, on uncontradicted testimony, reported his conclusion that the evidence was insufficient to support the charge; this court, however, rejected the conclusion and found that, as the evidence showed that the money was collected "probably in 1924" and not remitted until November 4, 1925, and as "no explanation is offered for his misconduct in withholding the money," and "there is no extenuating circumstance" shown, the evidence was sufficient to warrant disbarment.

On the second hearing the evidence concerning this charge was merely reproduced and was, therefore, identical with the evidence considered and referred to in our former opinion. The only reference found in the state's case to the time when the collection was made is found in a letter written to Mrs. Burns by the cashier of the Gordon Campbell Petroleum Company on March 14, 1925, in which he remitted the balance due Burns on the claim and in which he advises her that "the balance of this amount was paid to your lawyer at Great Falls some time ago, some of it more than a year ago." This, of course, was not primary evidence and merely gave rise to the conjecture, voiced in the former opinion, that McCue had retained possession of the money collected for a long time, dating back into 1924.

On the second hearing McCue testified that at the time he received the account, the debtor was involved in a great deal of litigation; that he advised Mrs. Burns that the collection of the account was "very doubtful" and depended upon finding property of the company not yet covered by attachment, and asked for and received $15 for costs in attaching property if found; that he did considerable investigation and traveling in order to locate property which might be attached and, having found property which he thought to be subject to levy, called upon Campbell who promised him that, if he would

forego action, he, Campbell, would settle the claim in full as soon as possible; that under the agreement Campbell paid him $100, "I think along the latter part of 1924," and promised payment of the balance shortly; that Campbell paid him the sum of $462.50, "I think about the fore part of March, 1925, or it might have been the latter part of February," and that Campbell then promised to pay the balance "very shortly"; that he thought it best to hold the amount collected until he received the balance and then have a full settlement with his client, by deducting his charges and expenses and remitting the net proceeds, but that almost immediately after receiving the second payment he was called to Cleveland, Ohio, on business, returning the latter part of March. Supporting his statement that he expected to receive the balance shortly is the showing that the debtor remitted the balance to Mrs. Burns direct on March 14, in the absence of McCue.

The accused, further testified that on his return he was involved in oil drilling operations and turned his law office over to a young attorney and devoted all of his time to the oil business, up to the early part of August; that about the 1st of August he received a letter from Mrs. Burns which called to his mind the collection, which up to that time, in the press of other business, had entirely slipped his mind; that he intended to remit at once, but that on the same day he received a telegram calling him back to Cleveland; that he left the same day, and, on arriving at Cleveland, he immediately became so absorbed in other business that he entirely forgot the matter and never thought of it again until he received a newspaper clipping commenting on the charges against him, whereupon he immediately wrote Mrs. Burns, accounting for the money collected and the manner in which it had been applied and inclosing remittance of the net proceeds, which were received and retained by Mrs. Burns. In her deposition Mrs. Burns makes no complaint that she had not received full settlement for the collection made; she states that she had no agreement with the accused as to the amount of his fees for collection;

and it is neither shown nor charged that the charge made was exorbitant or that, in this manner, McCue appropriated the $312 to his own use.

There is nothing in the record to support the charge that McCue refused to deliver the money collected to his client on demand, or that any demand was ever made upon him to do so. However, it was the duty of the attorney to remit to his client within a reasonable time, if not immediately, on making the collection, and no demand upon him was necessary, although this fact lends some weight to his plea of forgetfulness, in that it does not show that the matter was called to his attention by a demand from his client.

The referee found that the "plea of inadvertence" was uncontradicted, and that the evidence failed to show a conversion of the money to McCue's own use, and that the evidence does not sufficiently support the charge.

The showing made varies from that considered in the first opinion, in that it shows that the time elapsing between the collection of the money and its remittance was much shorter than we thought; that the accused was not in office, nor in the practice where his surroundings would tend to call a collection to his mind; that he was out of the state a great part of the time and was engrossed in other business and away from his home city during the time he was in the state. We, then, did not have before us any explanation of his failure to remit, nor did we have the explanation that he withheld remittance for a short time in order to make the full collection and thereafter, by reason of the circumstances related, forgot the matter. While the first reason given may constitute irregular practice, dangerous to one who may forget such matters, it in nowise constituted a conversion of the money or a wrong committed against his client; the circumstances may have justified even a careful practitioner in acting as did the accused.

The second excuse offered would be more plausible if it did not appear that the accused was reminded of his forgetfulness four or five months after his first lapse of memory, when it

would seem that any ordinarily prudent man would have remedied his dereliction immediately. However, he again has an excuse to offer for his second lapse of memory in the telegram received the same day calling him back to intensive labors in Cleveland, and, in support of the referee's finding in favor of these so-called "inadvertences," we must remember that the state did not show any communication from Mrs. Burns to the accused, but that he volunteered the information that he received a letter in August calling his attention to his oversight and that, had he been fabricating his testimony, he need not have weakened the fabrication by his voluntary admission.

There is no merit in the contention that the evidence was not conflicting; that fact makes it but stronger in favor of the accused. The rule with reference to a verdict of a jury or the findings of a court, sitting as a jury, is that such a trier of facts is made by statute the sole judge of the credibility of the witnesses and the weight to be given to their testimony (sec. 1062, Rev. Codes 1921), and has the superior advantage of seeing the witnesses on the stand and hearing them testify, and any verdict or finding made must stand if based upon and supported by any substantial evidence found in the record (*In re Carroll's Estate,* 59 Mont. 403, 196 Pac. 996; *Ball* v. *Gussenhoven,* 29 Mont. 321, 74 Pac. 781; *White* v. *Barling,* 41 Mont. 138, 108 Pac. 654; *Cohen* v. *Clark,* 44 Mont. 151, 119 Pac. 775, and many other decisions too numerous to cite), and this even though the record presents numerous inconsistencies in the statements of the witnesses (*O'Neill* v. *Montana Elevator Co.,* 65 Mont. 259, 211 Pac. 222). The rule that this court will not disturb a verdict of the jury or the findings of the trial court, rendered on conflicting evidence, is but a corollary to the above rule, and there must still be some substantial evidence in the record to support the verdict or finding. In other words, the two rules united mean no more than this: That, when a trier of facts has made a finding, we can go no further than to determine whether the record contains any substantial evidence to support the finding, and

[80 Mont. 537.]

if there is any contradictory evidence in the record it will be brushed aside and only the substantial evidence supporting the finding will be considered. Under the mandate of the statutes above, this rule has been extended to the findings of a referee in disbarment proceedings and announced in terms applicable to the case before the court. Thus in the *Lunke Case*, the court referred to the conflicting evidence rule. In the *Parsons Case* and the *Ryan Case* the court merely announced the rule as to substantial evidence, stating that the referee was much better qualified than the court to give to the evidence the weight to which it was entitled, and in the *Griggs Case* the court cited the last two decisions with approval and added: "In view of the fact that the record discloses the referee's findings are supported by substantial testimony, coupled with an appreciation of the advantageous position he occupied as a trier of the facts, we shall not interfere with his conclusion." This declaration applies with equal force to the conclusions of the learned referee in this case.

It is true that the showing that the accused failed to remit [3] the first $100 for a period of approximately sixty days, and then received the further sum of $462.50, and thereafter failed to remit any portion of the sum collected until after charges were preferred against him, and, in the absence of an explanation of his conduct, the referee and this court would be justified in presuming a guilty intent therefrom and in assuming that the accused converted the money so collected to his own use. The gist of the offense charged is the wrongful intent with which it is alleged to have been committed, and this intent "is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused." (Sec. 10727, Rev. Codes 1921.) However, if in a criminal prosecution evidence is introduced by the defendant so explaining the surrounding circumstances as to induce the jury to believe that the necessary guilty intent is lacking, no crime is committed and a verdict of not guilty is justified. And in such proceedings as this, where it appears that the withhold-

ing of money was not accompanied by a fraudulent or dishonorable intent, there can be no disbarment. (*People* v. *Humbert*, 51 Colo. 60, 117 Pac. 139; *In re Henderson*, 146 App. Div. 944, 131 N. Y. Supp. 544.)

The *Henderson Case*, above, is very similar to this specification against McCue; therein it appeared that the attorney's client gave him $285 for the payment of certain costs which were ordered paid by the court; for a period of five months he failed to make the payment, although repeated demands were made upon him. In this the case is stronger than that against McCue, and his excuse, set out in the opinion, is therefore less plausible than that given by McCue and lacks the element of forgetfulness contained in McCue's offered excuse, as he only testified that he "was careless in not making the payments promptly, but alleged in excuse that he was deeply engrossed in other important matters at the time, which required his careful attention and demanded his presence in other parts of the state." The supreme court of New York held that long delay, notwithstanding frequent demands, in the absence of a charge of actual misappropriation of funds, is not sufficient to warrant disbarment, and that the court could go no further than to "express its disapproval of the action of the attorney."

As it must be charged that the withholding of funds was with the intent to appropriate them to the use of the attorney, it must be proved by the surrounding circmstances that such intent existed, and the fact of its existence is one for the determination of the trier of facts from the circumstances proved.

It is true that courts are not compelled to accept as true, merely because someone swears they are true, statements which are so preposterous as not to be entitled to belief by any reasonable person, but while the acceptance of the testimony regarding, especially, this second lapse of memory may, on the cold record, be considerable of a strain on the credibility of men familiar with the practice in such matters, it must be remembered that the question as to whether the story told was

credible or incredible, preposterous or otherwise, was, at least primarily, for the referee, and, with his superior advantage in the matter, having decided that the accused was telling the truth, shall we now say, on the cold record, that the story was so preposterous as to be incredible, when one with the experience of the referee has, in fact, believed it?

And it must be further remembered that all men, even in the practice, are not endowed by their Creator with like retentive memories; that circumstances which might not affect the memory of one may, in another, wipe all recollection of an important transaction from his mind; and further, that the learned and experienced referee, who for many years occupied a position on the district bench of this state, had the advantage of observing the accused while testifying and of judging his credibility from his demeanor and apparent candor, which opportunity is denied us, and therefore, under the rules announced above, we will not now disturb his finding to the effect that the accused failed to remit by reason of forgetfulness, under circumstances excusing him in so doing.

4. From the findings made, the referee concluded that the [4] evidence was insufficient to support the charge. Accepting the findings, the conclusion necessarily follows. Counsel for the accused asserts that the conclusion must be adopted in any event, as we can disbar an attorney only for acts falling within the provisions of section 8961 above, and that this charge could only fall within subdivision 5 thereof, relating to acts involving deceit, malpractice or crime. While we must find our authority for disbarment in the section referred to, subdivision 2 thereof provides for disbarment for "wilful disobedience or violation of an order of the court, * * * violation of the oath taken by him, or of his duties as such attorney." Clearly, it is the duty of an attorney to remit money collected to his client, and a *wilful* omission to do so constitutes a violation of his duty and will subject the attorney to punishment where no deceit is practiced, but he frankly admits his delinquency. (*In re Jewell,* 60 Mont. 602, 201 Pac. 266.)

[80 Mont. 537.]

5. Specification No. 2. In addition to the evidence considered
**[5]** in the former opinion, relative to the charge of perjury,
we have before us the accused's version of the circumstances
leading up to his statement before Judge Leslie on September
14, 1923, that he did not then have a certain note in his pos-
session, but that it had been sent to the Pacific Acceptance
Corporation. Accused testified that some time prior to 1923
he had taken possession of a certain truck for the Acceptance
Corporation, with power to sell it; that he sold the truck to
the Northfield Oil Company, of which he was one of the
trustees, and thereafter he disposed of the effects of the oil
company, receiving, in addition to cash, a note for $1,500; that
the Acceptance Corporation agreed to accept this note in full
satisfaction of its claim for the truck, providing it was paid
on maturity in October, 1923; that on receipt of the note he,
on the 23d or 24th of August, 1923, indorsed it to the Pacific
Acceptance Corporation and immediately delivered it to W. A.
Stevenson, his partner, who was an agent for the corporation,
with *instructions to send it to the corporation, and that Steven-
son then promised to do so; that, at the time he testified before
Judge Leslie, he fully and firmly believed that the note had been
sent and did not discover his error until after the corporation
commenced action for the value of the truck and its attorney
advised him that the corporation had never received the note,
when he searched Stevenson's files, found the note, and de-
livered it to Stephen J. Cowley, attorney for the corporation.

As indicating that the note was not even indorsed until
delivered to Cowley, Judge Cowley testified that at the time
McCue gave him the note, McCue, while in an adjoining room,
took some papers from the file and wrote something on one of
them, but could not say that the writing was done upon the
note. The accused testified that at that time he entered, upon
a memorandum attached, the fact of delivery to Cowley.

Section 10878, Revised Codes 1921, declares that every person
who, having taken an oath to testify "truly" before a com-
petent tribunal, "wilfully and contrary to such oath, states as
true any material matter *which he knows to be false,* is guilty

of perjury." Thus, by statute in this state, *knowledge* of the falsity of the testimony, on the part of the accused, is made a necessary element of the crime of perjury. When a witness states as true that which he had no good reason to believe to be true, his testimony may be equivalent to stating that which he knows to be false; but here the accused gave plausible reasons for his sworn statement that at the time he gave the testimony he believed it to be true.

The referee found that the testimony of the accused that he did not know at the time he testified that the statement made was false, but firmly believed it to be true, was uncontradicted and accepted his reasons for his belief as sufficient, and therefore concluded that the evidence was insufficient to support the charge of perjury. Again, he had the advantage of seeing the witness on the stand and had under consideration a record devoid of positive proof; on the record, as it is before us, we cannot say that the referee erred either in his findings of fact or conclusions of law.

6. Specification numbered 4 deals with the issuance of [6] worthless checks as a basis for a charge of grand larceny. In the first opinion we considered the undisputed evidence that on July 27, 1925, McCue issued and delivered to one Hillis two checks for $200 each and told the payee that they were absolutely good; that the checks were "cashed" by a third party who, relying upon the statement of McCue, paid full value for them; that they were presented for payment and payment refused for insufficiency of funds, but were compelled to hold the evidence insufficient to support the charge, as it did not bring the act within the provisions of section 11369, Revised Codes 1921, defining the crime of grand larceny by the uttering of fraudulent checks, but it is there stated that: "The fact remains that he executed and delivered to Hillis two worthless checks under circumstances indicating clearly his expectation that the checks would be put in circulation in the business world. The moral quality of this act needs no comment."

The state's case, by cross-examination largely, on the second hearing disclosed that the checks were given in connection with

gambling transactions in rooms operated by the payee Hillis and were transferred to Harcourt, the supposed purchaser, in settlement of his "percentage" as rental of the gambling rooms.

McCue testified that on the day he executed the checks he had been in the oil field, returning to Shelby about 7:30 in the evening, tired, hungry and thirsty; that he went to the poolhall run by Harcourt and another in order to get a drink of whisky before getting his supper; that he had one drink, or possibly two, and within three or four minutes after taking the first drink was "completely knocked out"; that Hillis told him they had an easy poker game on for that evening, and, on his saying that he had with him only necessary expense money, Hillis told him to write a check and he, Hillis, would see that the accused received chips with which to play; that he wrote the first check on the account of T. F. McCue, trustee, but thinking that he should not have done so, wrote the second check, signing it T. F. McCue, and intending to destroy the first check, but delivered both to Hillis, intending to return and receive chips for the $200 and therewith to play poker. He testified that he had no recollection of playing, and thinks that, by reason of something given him in the drink, he became sick, went directly to his room and to bed, leaving town the next day without seeing Hillis; that, had the check been given for consideration in a legitimate transaction, he would have seen that it was paid. He further testified that he told the bank on which the checks were drawn to stop payment on any such checks presented.

The checks show that they were presented and not paid; the "trustee" check being marked "N. S. F.," which the assistant cashier stated means "not sufficient funds," and the personal check marked "Not properly signed." The cashier testified that at the time of the transaction the account of T. F. McCue, trustee, had in it but $4.74 and thereafter reached a maximum of $55.84, and that McCue personally carried no account in the bank. McCue testified that he always carried a personal account in the bank, and that the

cashier was mistaken. After the hearing was closed, by agreement McCue was permitted to file with the referee a statement to the effect that he was mistaken in his testimony concerning his personal account; that he carried it in the name of McCue & Stevenson, a former partnership, in order to prevent attachment by creditors of oil concerns in which he was interested, but that the fund was his personal property and the bank always, at his direction charged checks signed by him personally against this fund; parenthetically it may be said that it is then strange that the bank marked the check "not properly signed," although the indorsement indicates some reason other than that the accused had no account there. However, this testimony did not materially aid the accused, as the bank's ledger sheet for this account shows that there was therein, on the date the checks were drawn, but $4.69 which was reduced to $.19 the next day and remained at that low ebb until August 11, when $100 was deposited, but that the account was entirely depleted by the 26th of August.

While this evidence was wholly insufficient to support the charge made, and the report of the referee must be adopted as to this charge, the "moral quality" of the transaction, referred to in the first opinion, was in no manner bettered by the recital of the accused of his reprehensible conduct on the day in question, nor by the fact that he was consorting with bootleggers and gamblers, drinking bootleg whisky, and consenting to violate the law by playing poker for money, for which purpose he issued worthless checks either with the intention of making them good, or of gambling with a chance to win and no fear of losing.

7. Specification No. 5 alleges that on an account forwarded [7] to him for collection by the Wyman, Partridge Company, of Minneapolis, McCue collected the sums of $250 and $264.10, which sums he failed to remit to his client. In preparing for the hearing the attorney general attempted to secure a deposition from the complainant with its original records attached, but without success. On the hearing, McCue was called to the

stand to explain what happened to alter the position taken by his client. It then appeared that, immediately upon the addition of this charge to the complaint, McCue wrote the Wyman, Partridge Company, contending that his partner, Stevenson, who was but a collector and not a lawyer, and who had worked for the company at one time, had full charge of their collection, with their knowledge, while he, McCue, knew nothing of either the collections or failure to remit although it appears that he did receipt to the debtor for the first payment of $250; that the $250 was remitted in a letter of which he produced a carbon copy, and by check for which he produced the stub; also it appears that the check was unsigned and was therefore returned.

After considerable correspondence, all of which McCue produced, McCue wrote the company that, if they would write the attorney general telling him that they had found that he, McCue, had nothing to do with making the collections or failing to remit, and have the charges dismissed, he would pay them whatever sum they said he was owing. The company wired McCue on April 27, 1927: "Deduct usual commission send bank draft will return it charge not withdrawn." Thereupon McCue mailed the company his draft for $555.50, which amount he swore on the hearing he did not owe. He introduced a letter in which he claimed to the company that they had not done as they agreed and stated on the stand that he would require the company to return his money.

The referee reported that "there is not sufficient proof offered in support of specification 5; the only testimony introduced being that of the accused and certain communications from the Wyman, Partridge Company"; that the testimony of the accused that he did not handle the collection and knew nothing of it was not contradicted and shows that the business was handled by Stevenson; that the company "utterly failed to provide testimony" on which findings adverse to the accused could be made.

With what is said by the referee we must perforce agree. By reason of the failure and refusal of the complainant to furnish evidence of wrongdoing on the part of the accused, the attorney general was forced to go into the enemy's camp and seek to establish the charge by the testimony of the accused himself and was bound by his testimony, which stands undisputed in the record. It therefore appears from the record that the Wyman-Partridge account was placed in the hands of McCue and Stevenson for collection, but that in so placing the account the client referred it to Stevenson, who had worked for the company; that Stevenson alone handled the matter, made the collections and was presumed to make the remittances; that McCue had no knowledge of what was being done in the matter or of any collection made, with the exception of the $250 collection, for which the files of the office showed that remittance was made, less reasonable fee for collection. The dereliction, if dereliction there was, was that of Stevenson and not that of McCue, and, whatever the civil liability of the accused, he was, under the evidence, guilty of no act or omission involving moral turpitude, deceit, fraud, or wrongful intent.

The evidence stands uncontradicted, further, in showing that the firm of McCue & Stevenson was, in fact, not delinquent in this regard, or at least that it was owing to the company but a small amount, and that McCue remitted the sum of $555.50 to the company, knowing that he did not owe that amount, but for the purpose of inducing the officers of the company to retract their statement originally made to the attorney general and cause the withdrawal of the charge made. On this phase of the case we desire to express the opinion that the conduct of both the accused and the officers of the Wyman, Partridge Company was highly reprehensible. We are amazed at the spectacle of a presumably reputable business concern thus using the office of the attorney general as a collection agency and being willing to suffer one, whom they believed to have been guilty of the misappropriation of the funds of the

company for approximately four years, to escape punishment for his act, providing by so doing they could collect the amount due the company; such action comes perilously near, if not over, the line of the prohibition against compounding crimes, found in section 10931, Revised Codes of 1921. As to the accused, it is more than passing strange that a man who had been long in the practice of an honorable profession should stoop to the method here employed to prevent a full and fair hearing on a charge involving his good name and professional conduct, when, as he testified, he had in his possession proof which would have cleared him of the charge, or pay in excess of $500 which he did not owe rather than face an unjust charge in a straightforward manner. He had not even the excuse of avoiding a hearing and undesirable publicity; the latter he had already had, and regardless of this charge he was compelled to go to hearing on at least three charges involving his professional conduct.

However, the conduct of the accused in this respect did not constitute a charge against him under the complaint on which he was tried and by which both the referee and the court are bound.

8. It is suggested that the record shows that McCue was [8] morally delinquent in connection with the transactions involved in the fourth and fifth specifications, and that, although the evidence is insufficient to support the charges made or to warrant disbarment, he should be suspended for a period and until by contrition and exemplary behavior he demonstrates his fitness to again enter the ranks of those engaged in the high calling of the practice of the law.

This might be a proper solution of the matter, had we the power to enter such a judgment in this proceeding. However, while no man may be admitted to practice law in this state initially, except he be ''of good moral character'' (sec. 8936, Rev. Codes 1921), or on production of his certificate from another state, except on the production of ''satisfactory evidence of good moral character'' (sec. 8940, Id.), we are not

made the guardians of the private morals of practicing attorneys. Complaints may be instituted and prosecuted against attorneys only for the violation of their oaths as attorneys or having been guilty of conduct authorizing suspension or disbarment (secs. 8951, 8952, above), and we are given authority to disbar an attorney, or to suspend, when we feel that the record does not warrant absolute disbarment, only when such complaint is made and the proof thereof brings the acts or omissions of the attorney within the provisions of section 8961 above, which declares that an attorney may be removed or suspended for any of the following causes: (1) His conviction of a felony or misdemeanor involving moral turpitude; (2) wilful disobedience or violation of an order of court, and any violation of the oath taken by him, or of his duties as such attorney; (3) corruptly or wilfully and without authority appearing as attorney for a party to an action or proceeding; (4) lending his name to be used by one not an attorney; and (5) being guilty of deceit, malpractice, crime or misdemeanor involving moral turpitude.

Here the conduct complained of as unfitting the accused to remain in practice without correcting his morals is not specified as a charge against him in the complaint, and therefore does not form a basis for suspension or disbarment, if it could be charged under the provisions of section 8961 above.

We do not say that the provisions of subdivision 5 of section 8961 are not broad enough to warrant suspension of an attorney for moral delinquency falling short of the commission of a crime, but we do say that in this proceeding we can punish the accused, if he is to be punished, only for those acts or omissions charged in the specifications made against him in the complaint on which the hearing was had.

In *In re Weed,* 26 Mont. 241, 67 Pac. 398, with quotations from *In re Wellcome,* 23 Mont. 140, 58 Pac. 45, it is said that " 'The fifth subdivision, notwithstanding its ungrammatical construction, seems to have been enacted *ex industria,* to the end that the court may purge the bar of those attorneys whose char-

acters, *as illustrated by the evidence establishing the truth of the charges preferred* [italics ours] lack the attributes of morality which are an essential to admission, and which should be required as a continuing condition of the right to practice.' In other words, when an attorney is shown to have committed a crime or misdemeanor, attended by such circumstances as imply moral turpitude, or when he has been guilty of such gross misconduct falling short of actual crime that it must have been the result of a depraved nature or immoral habits, rendering him unworthy of the confidence of his fellowmen, he should be deprived of the right to remain in the profession, just as the right to enter it would have been denied him had he been shown to possess the same attributes of character at the time he applied for admission.''

In *In re O'Keefe*, 55 Mont. 200, 175 Pac. 593, it is said: ''A character for honesty and integrity is as necessary, to justify his retention of the privilege after he has acquired it, as it was to acquire it in the first place; and when his conduct is such that he has forfeited his right to the confidence of the public, he has forfeited his right to the privilege also.'' But in each of the cases mentioned the court was speaking of charges made in the manner prescribed by the statute. In the *Wellcome* and *O'Keefe Cases* the charge made and sustained by the evidence was of the commission of a crime involving moral turpitude, while in the *Weed Case* the charge was not sustained, and the comment was made in connection with a judgment of dismissal.

Here the charges are definite and specific. The fourth specification, on which we commented as to the moral quality of the acts of the accused, is that the accused was guilty of grand larceny, not that he was guilty of moral delinquency, and the latter is not a criminal offense included in the greater offense charged. In the fifth specification the charge is conversion of a client's money, not bribery to prevent a witness from testifying or moral delinquency akin to bribery.

Further, we cannot say, on the record concerning matters not presented by formal specifications of charges and not presented nor argued either before the referee or before this court, that the moral delinquencies referred to would constitute sufficient ground for disbarment or suspension, if properly presented. As was said by Mr. Justice Field in a vigorous dissenting opinion to *Ex parte Wall*, 107 U. S. 306, 27 L. Ed. 552, 2 Sup. Ct. Rep. 604: "It is not for every moral offense which may leave a stain upon character that courts can summon an attorney to account. Many persons, eminent at the bar, have been chargeable with moral delinquencies which were justly a cause of reproach to them; some have been frequenters of the gambling table, some have been dissolute in their habits, some have been indifferent to their pecuniary obligations, some have wasted estates in riotous living, some have been engaged in broils and quarrels disturbing the public peace; but for none of these things could the court interfere and summon the attorney to answer, and if his conduct should not be satisfactorily explained, proceed to disbar him. It is only for that moral delinquency which consists in a want of integrity and trustworthiness, and renders him an unsafe person to manage the legal business of others, that the courts can interfere and summon him before them. He is disbarred in such case for the protection both of the court and of the public."

"Indulgence in vices affecting to some extent the moral character, but not personal or professional integrity, is not a sufficient ground for disbarment." (Note to *State* v. *Kirke*, 95 Am. Dec. 333, at page 339, citing cases.)

On the record before us and on the charges preferred against the accused, we must concede that there is substantial evidence warranting all of the findings of the referee and that those findings support the conclusions reached by the referee on the specifications contained in the complaint.

If this matter were before us for an original determination upon the testimony introduced at the hearing, we might be disposed to reach a conclusion thereon differing from that

arrived at by the learned referee who heard it, but under the statutes of this state, above referred to, and the rule heretofore adopted and followed by this court in connection with the findings made by referees in disbarment proceedings, quoted above from *In re Lunke,* that "whenever they depend upon conflicting testimony, they will be treated as unassailable if there is any substantial evidence to sustain them," we are constrained to adopt the report of the referee and dismiss the proceeding, and it is so ordered.

*Dismissed.*

Associate Justices Stark and Galen concur.

MR. CHIEF JUSTICE CALLAWAY, dissenting:

This court undoubtedly is committed to the rule that "while the findings of the referee are not absolutely conclusive, they are to be given the same dignity as a special verdict by a jury or the findings of a trial court, and whenever they depend upon conflicting testimony, they will be treated as unassailable if there is any substantial evidence to sustain them." (*In re Lunke,* 56 Mont. 226, 182 Pac. 126; *In re Griggs,* 74 Mont. 373, 240 Pac. 820.)

When there is no substantial conflict in the evidence a case is stripped of questions of fact, and it remains to determine the questions of law which arise upon the facts. When the evidence justifies but one conclusion the law requires judgment to go accordingly. (*Milwaukee Land Co.* v. *Ruesink,* 50 Mont. 489, 148 Pac. 396.)

As said in the majority opinion the findings of a referee must rest upon the evidence, and his conclusions upon their soundness in law. Where the evidence is in conflict the finding of the referee will be held conclusive. Where not in conflict his finding is persuasive only. If he draws the wrong conclusion from the facts the court should disregard the conclusion.

In this case a situation was presented the recitation of which may serve an explanatory purpose. After this court, upon a

[80 Mont. 537.]

showing not very strong, in order to give the accused an opportunity to clear himself of the charges made against him, had set aside the default of the accused, and had again referred the matter to Judge Cheadle, the accused filed in this court a motion, based upon some trifling occurrence in the past, objecting to Judge Cheadle as referee. This court ordered the flimsy motion stricken from the files but simultaneously with the making of the order a communication in writing was received from counsel for accused withdrawing the motion. In view of these facts, known to the referee, I think that distinguished and honorable gentleman in an endeavor to be meticulously fair in his judgment of the accused, leaned too far in his favor. Be that as it may; I propose to decide this case for myself on the accused's own testimony.

1. In the beginning he received for collection from Mrs. Burns a claim against the Campbell Petroleum Company, in amount $1,050. It was a claim for labor done by Mr. Burns. On November 21, 1923, he asked for $15 "court costs." A week later, acknowledging the receipt of the money, he advised Mrs. Burns that Burns had a right to a lien for his services; the lien, he said, "attaches to all equipment upon the lease, on the leasehold interest, and on any material or production that is there." He requested an itemized statement from Mr. Burns, saying that upon its receipt he would prepare the lien claim for Burns' signature and verification. "I will then file it and we can foreclose the lien and secure Mr. Burns' money."

So far as the record discloses accused never again communicated with Mrs. Burns until after this disbarment proceeding was commenced.

During "the latter part of 1924" the Gordon Campbell Petroleum Company paid accused $100 to apply on the Burns account. When was it paid, in October, November or December? The accused does not say; why does he not say?

In "the fore part of March, 1925, or it may have been the latter part of February," the company paid him $462.50 more on the account, and the company agreed to pay him the balance

very shortly. Soon after receiving that money he went to Cleveland, remaining there until the latter part of March. In the meantime the company had sent directly to Mrs. Burns the balance due her. When accused returned to Great Falls, did he demand of the company the balance which it had promised to pay very shortly? He did not. The first of April, on account of his being otherwise engaged, accused turned over his office to a man named Brown, whose duty it was "to take care of everything that was there." Did he turn over the money he had collected for Burns to Brown, or say anything to Brown about the Burns matter? He did not. Now as to his explanations. "The fact was I really forgot all about this matter, had no further communications with Mrs. Burns and I overlooked it entirely." He was in the oil field during the spring and summer of 1925. He was called to Cleveland about the middle or latter part of August. "I had forgotten about the Campbell matter, about this claim, had not heard from Mrs. Burns, but I first off did not remit it to her because I was expecting to collect it all." "On account of drilling this, well and being engaged in the oil business I had forgot all about it and never heard anything about it; it slipped my mind." Just before he left Montana in August, 1925, on his trip to Cleveland, he received a letter from Mrs. Burns inquiring about the matter "and when I went down to Cleveland, got engaged in this other business, I forgot about it, until my attention was called to it, as I say, through the newspaper clipping." "If it had not been that I was engaged otherwise, in fact, forgot about it, and been a little negligent on account of having turned the office over to Brown, I sort of went out of the office, did not have anything to do with it." "If it had not been that I was connected with the oil business, spent my time on that, was all wrapped up in it, I would have taken care of it sooner." "I got a letter the morning I left here calling my attention to it, and I then intended to take care of it, but this telegram called me down there, and when I got

down there I got into that work, looking after that matter, and I really forgot about it."

Undoubtedly prospecting for oil is an absorbing activity, but it is hard to believe that it engulfs its votaries in any such maelstrom of intensity as this. He explains further: "I would have remitted it on the day I got it if it was not for the fact that I had been promised he would pay the balance shortly."

"Q. Now, Mr. McCue, was it because you had forgotten you had made this collection for Mrs. Burns, or was it because you were waiting for the balance, to pay the balance, that you delayed as long as you did in making the payments? A. No, I delayed first off, if it had not been upon the promise of Campbell I would have remitted immediately. The temporary delay was on account of the promise that he would pay it all shortly.

"Q. About how long after you received the money did that temporary delay occasioned by that cause occur? A. Well, it occurred up to the time I left there. I left in March, 1925, and went east."

When at Rochester, New York, a friend called his attention to a clipping from a newspaper in which he found that charges had been presented against him by the attorney general. He immediately went to Cleveland, where he had his money, wrote Mrs. Burns a letter, with which he transmitted a draft for $377.20. His memory then was keen; although his books were in Great Falls, he explained his version of the transaction in detail, remembered the receipt of the sums of $15, $100 and $462.50, and his expenses in the matter down to the cent.

His excuses for his delinquency fall under two heads: (1) he would have remitted immediately if he had not been promised the balance; (2) he forgot. Under his own showing, and with due consideration for human frailty, neither excuse is tenable. It was his duty to send the $100 which he collected in the latter part of 1924, possibly as early as October, immediately to his client, laboring people. It may be presumed they had some use for it. Surely the sum was large enough to warrant remittance promptly.

In the case of *In re Waddell,* 54 Mont. 597, 172 Pac. 1036, it was shown that Waddell collected money on May 12 which he did not remit until October 16. When he collected the money he did not report the fact but concealed it; three months and a half thereafter he wrote his client that he expected to get the claim settled in from four to six weeks. The court said: "This breach of faith and deceit alone would command his disbarment, but his failure to pay over to his client promptly the money he had collected was equally reprehensible."

Now accused did not forget this $100; he was only holding that until he should collect more, according to his testimony. Even if he received it in December, why did he withhold it until the latter part of February or the first of March? Is this temporary delay? If he could hold it two or three or four or five months, why not a year? When he received the $462.50 he had $562.50 to remit. He did not do so; he forgot. He did not remit, nor did he write to Mrs. Burns, upon receiving her inquiry in August. Was he too busy when upon the train to acknowledge the receipt of her letter? It would seem that the ordinary man would have taken the time to answer the letter and to assure her that the money would be remitted at the earliest practicable date.

"No demand was made upon him." Demand from a client whom he had kept in the dark and who did not know he had collected a cent?

It is said he did not convert the money to his own use. Let us see whether the record justifies this assertion.

When the accused received the money what did he do with it? Did he keep it separate from his own funds? He did not so testify. Every indication is that he commingled it with his own funds and used it for his own purposes. The record shows that on July 27, 1925, he had but $4.74 in his T. F. McCue Trustee account; this account was used in carrying on his oil business. He did not then have any bank account in his own name. After his partner, Stevenson, withdrew from

the firm of McCue & Stevenson in 1924, accused carried his personal funds in an account in the firm name until some time in July, 1925, after which he held his funds—"my funds," he says—in his safety deposit vault. After July 1, 1925, he did not have to exceed $100.19 in the McCue & Stevenson account at any time and that was upon August 11. On August 20 his balance was $5.08. When he remitted to Mrs. Burns on November 4, 1925, he did so from Cleveland, Ohio, where he says, "I had my money." If he did not employ his client's money for his personal uses he should have said so. This money was a trust fund in his hands. "He had no right in law or morals to mingle the trust funds with his own private property, or to profit by the use of funds belonging to his client. (*In re Allard's Guardianship*, 49 Mont. 219, 141 Pac. 661.)" (*In re Lunke*, supra; *Sparhawk* v. *Sparhawk*, 114 Mass. 356.) It is said he frankly admits his delinquency. It is difficult to see how he could do otherwise after his letter of November 4, 1925, to Mrs. Burns, which was after this proceeding for his disbarment had been filed.

So it seems to me that upon the accused's own testimony the learned referee has drawn the wrong conclusion. Accused is excused on the ground of forgetfulness,—inadvertence, it is called. Inadvertence is "an effect of inattention; a result of carelessness; an oversight, mistake, or fault from negligence." (Webster's International Dictionary; *Greene* v. *Montana Brewing Co.*, 32 Mont. 102, 72 Pac. 751.) What is excusable neglect on motions to set aside default judgments has been considered by this court. In *Herbst Importing Co.* v. *Hogan*, 16 Mont. 384, 41 Pac. 135, a showing that the defendant's counsel was very busy with other professional matters, was embarrassed by attention upon members of his family who were ill, and was himself absent, being called away by the illness of his mother, was held insufficient to excuse a want of answer on part of defendant.

In *Scilley* v. *Babcock*, 39 Mont. 536, 104 Pac. 677, the defendant's counsel, who was a candidate for public office, in the heat

of a political campaign and because he was busily engaged in the canvass for votes, simply forgot all about his clients' case. Held no excuse upon a motion by them to set aside their default for want of appearance. (And see *Vadnais* v. *East Butte Extension Copper Min. Co.*, 42 Mont. 543, 113 Pac. 747.)

It stands admitted in the record that accused received the Burns claim in November, 1923; that after November 21, 1923, he did not communicate with his clients until November 4, 1925, after this proceeding was instituted, a period of nearly two years; that in the latter part of 1924 he collected $100, which he did not remit for nearly, or quite, a year; that about March 1, 1925, he collected $462.50 which he retained for eight months, notwithstanding his receipt of Mrs. Burns' letter in August, 1925. That this excuse of forgetfulness, under the circumstances, can be regarded with seriousness by the judicial mind seems to me inconceivable.

Before the rendition of the majority opinion I should have said that lawyers who collect money for their clients and forget to remit must present better excuses than those presented in this case, if they expect to be allowed to continue in a profession in which honor and integrity are watchwords. "The three main requisites of a lawyer are learning, diligence, and integrity; but the greatest of these is integrity." (*In re Duncan*, 64 S. C. 482, 42 S. E. 433.) Integrity is "moral soundness, honesty; freedom from corrupting influence or practice, especially, strictness in the fulfillment of contracts, the discharge of agencies, trusts and the like; uprightness, rectitude." (Webster's International Dictionary.)

2. The referee's findings and conclusions as to specifications 2 and 4 must be sustained, in my judgment.

3. The referee's finding and conclusion upon specification No. 5 is more difficult. But the accused's testimony here is evasive, shifty and contradictory.

In answer to the inquiry whether Wyman, Partridge & Company had placed in his hands the claim against the Eager Mercantile Company he answered they had not, but to the

next following question, "Had any such claims been placed with the firm of McCue & Stevenson, with which you were at that time?" he answered, "From the correspondence I find that there was." In answer to the question as to whether McCue & Stevenson accepted the claim from Wyman, Partridge & Company he said, "I presume they did." Yet in a letter written to that company with respect to this very matter he said: "I also know I did a great deal of work in 1924 ... bunch of notes they sent us as collateral; afterwards your representative called and took these notes and we never got a postage stamp for our trouble and time spent and unquestionably if we were permitted to keep those notes, results would have been realized on this work." He said that he did not know whether the firm collected $250 from the Eager Mercantile Company, but as a fact, long before the time he testified, he had written a series of letters to Wyman, Partridge & Company in which he showed that he was thoroughly familiar with the fact; that the ledger showed that on November 8, 1923, McCue & Stevenson credited the Wyman, Partridge & Company account with $250 received from Eager Mercantile Company on November 14, 1924. Wyman, Partridge & Company were sent check No. 3025 for $230 and charged a commission of $20, which should have been $37.50. In answer to the question whether the Eager Mercantile Company had paid $264.10, he said, "I think they paid it to the firm of McCue & Stevenson." All he knew about it, he said, "is what I looked up since returning to the state of Montana." "I would say that, as far as my personal knowledge is concerned, I have no personal knowledge, but after looking up such evidence as I had after returning here to Montana, I believe they did." The truth is that he personally signed a letter dictated by himself, dated December 27, 1923, addressed to Eager Mercantile Company, acknowledging the receipt of a check for $264.10 to apply on the account of the Wyman, Partridge & Company. He said he did not know whether McCue & Stevenson ever notified Wyman, Partridge

& Company of the receipt of the $264.10. In a letter to that firm dated March 12, 1927, he said, "I do not want to convey the impression that I am intending to recoup by any charges. The books show no remittance for the $264.10 and I confess that it was my duty to have such a matter attended to, but it never came to my notice and as far as I am personally concerned, it was a clear oversight, but it is a matter that can be squared in dollars and cents."

On the 23d of April, 1927, McCue paid Wyman, Partridge & Company the sum of $555.48. His claim that he did not owe that company anything and that he had a right of recoupment against it is manifestly an afterthought. His reasons for remitting the $555.48 only make the matter worse. Did the accused as an innocent man, asserting his innocence, demand an investigation of the charge and his vindication? No, he paid a sum of money on condition that the charge be dismissed. It was suggested in conference that specification No. 5 is not based upon the action of accused in attempting to suppress evidence; but this testimony came out in the hearing. It was competent, and serves to illustrate the entire transaction. It condemns the attempted explanation of the accused. The reprehensible conduct of Wyman, Partridge & Company is commented upon in the majority opinion.

But it is said the referee saw the accused upon the witness-stand, heard his voice, observed his appearance and demeanor and was much better qualified than is the judge sitting in review to give the testimony the weight to which it is entitled (*In re Griggs*, 74 Mont. 373, 240 Pac. 820), and that the referee's finding upon conflicting testimony will not be disturbed. (*In re Lunke*, 56 Mont. 226, 182 Pac. 126.) Granted. But here the testimony is not conflicting; the facts set forth above are admitted. Here neither honest appearance and demeanor nor unctuous words can blot out the damning facts.

4. Now, a word with respect to our power in the premises. The power to strike the name of an attorney from the rolls is inherent in the court itself. "No statute or rule is necessary

to authorize the punishment in proper cases. Statutes and rules may regulate the power but they do not create it. It is necessary for the protection of the court, the proper administration of justice, the dignity and purity of the profession, and for the public good in the protection of clients." (Weeks on Attorneys, 2d ed., sec. 8.) Surely this is a case which calls for an exercise of the disciplinary powers of this court over an attorney who has been remiss in the discharge of duty.

For these reasons I cannot agree to a dismissal of this proceeding.

MR. JUSTICE MYERS, dissenting:

I dissent from the majority opinion. I cannot accept the conclusions stated in that opinion. I think the conclusions of the referee should be rejected and that the court should find the accused guilty on every specification of guilt in the accusation.

As to the specification that the accused collected money on the Burns claim against the Gordon Campbell Petroleum Company and failed and neglected to remit the same, to my mind it is amply proven. I do not believe a word of his testimony that he collected $562.50 and forgot all about it and that he forgot it a second time, after being once reminded of it, months after he had collected it; and that he remembered it sufficiently to do his duty and remit only after he learned that disbarment proceedings had been started against him. It is repugnant to human credulity. I think it so absurd, incredible and improbable as to be unworthy of belief. I am not required to accept findings which are contrary to ordinary human experience and which are based on testimony which, inherently, within itself, is so improbable that I cannot believe it to be true. The inherent improbability of testimony may deny it all claim to respect. A court is not bound by mere swearing. It is swearing credibly that is to influence its judgment. This court is not bound by findings of trial court, jury or referee that are based on testimony which, inherently, is

so improbable as to be incredible. It has been so held many times by this court. A few of the cases so holding are: *Landsman* v. *Thompson,* 9 Mont. 191, 22 Pac. 1148; *Nelson* v. *Big Blackfoot Milling Co.,* 17 Mont. 553, 44 Pac. 81; *Moelleur* v. *Moelleur,* 55 Mont. 30, 173 Pac. 419; *Casey* v. *Northern Pac. Ry. Co.,* 60 Mont. 56, 198 Pac. 141; *First State Bank* v. *Larsen,* 65 Mont. 404, 211 Pac. 214. Testing testimony by that rule, I am to be a judge of it as much as is a referee. I consider the testimony of the accused about his remarkable forgetfulness to be testimony of that character. If an accused attorney is to be absolved of guilt, in such a matter, merely upon his naked testimony that he forgot all about the incident, it will be impossible to disbar any attorney for collection and conversion of his client's money, in any sum; he can simply swear he collected and spent the money and forgot all about it, even to the receipt, for collection, of the claim, no matter how large. A simple process!

As to the specification of issuance of worthless bank checks, the attempted explanation of the accused makes the offense worse, I consider, than did the unexplained proof of the prosecution. A lawyer, a person who attends to the business of others and, at times, handles money of others, has no business, drunk or sober, issuing worthless checks. One who does it, intoxicated or otherwise, is unfit to practice law. The circumstances under which the accused did it, as explained by him (doing it while under the influence of bootleg whisky, in a gambling joint, with intent, apparently, to fleece somebody and get some dishonest money in a crooked card game), only aggravates his offense, in my opinion.

As to the specification of perjury by the accused, admittedly he swore to an unqualified statement as being true, when he did not know it to be true and when he could have ascertained easily it was not true. That is the best construction that can be put upon it for him. There is no doubt about the facts. The only thing to do is to draw a conclusion. His testimony

[80 Mont. 537.]

in question constituted perjury. He did not have to know it to be false. (Sec. 10887, Rev. Codes 1921.)

As to the specification that the accused collected money, which he failed to remit, for Wyman, Partridge & Company, his sworn statement that, after the preferment of the charge, he sent that firm $555.48, which he did not owe, as he claimed, upon condition that the firm drop the charge, is sufficient to disbar him. In other words, according to him, he sent the firm $555.48, he did not owe, to buy it off. That is the unvarnished effect of his testimony; what it amounts to. Upright men, innocent men, do not buy off prosecutions. To do so is simply to use vicious and corrupt methods to pervert the administration of justice; to corrupt and prostitute the courts, the fountains of justice. A lawyer who would do such a dishonest thing, who has no higher sense of integrity, is unfit to practice law and is a disgrace to his profession. True, the accused is not charged with giving a bribe to buy off a prosecution but his confessed act in sending the money, to have the charge dropped, convinces me it was the money of the claimant and that he was guilty of the charge of collecting the money for the claimant and failing to remit it. I think that the only reasonable conclusion to be drawn.

As I view it, this record is full of insincerity of the accused, trifling with justice, trifling with this court, perjury, evidence of lack of integrity, evidence of guilt. I think for the accused to be allowed to continue to practice law will be a reproach to the profession, a menace to the public.

In my opinion, when disbarment charges are referred, for hearing, to a referee, the testimony heard should be reported to this court·and the court ·should make its findings and draw its conclusions. I think that should be made the rule. If we have not adequate rules to rid the profession of the law of unworthy and unfaithful practitioners, it is time we should make some, within constitutional and statutory limits. This court is the institution entrusted with the duty of purging the profession of unfit members; not a referee; ours is the respon-

sibility. It is the duty of this court to pass on the facts in disbarment proceedings and I favor doing it, even though some procedural rules must be altered. However, in this case, I do not believe that necessary. Even under the precedents of our prior decisions in disbarment proceedings, I believe the evidence in this case amply sufficient to require disbarment; believe the undisputed facts such that inevitably conclusions of guilt as to all specifications should be drawn from the facts. I believe the accused should be permanently disbarred.