STEPHENSON, Respondent, v. RAINBOW FLYING SER-
VICE, INC., Appellant.

(No. 7,304.)

(Submitted January 8, 1935.  Decided March 13, 1935.)

[42 Pac. (2d) 735.]

*Messrs. Molumby, Busha & Greenan,* for Appellant, submitted a brief; *Mr. L. J. Molumby* argued the cause orally.

*Mr. W. F. O'Leary* and *Mr. E. J. Stromnes,* for Respondent, submitted a brief; *Mr. Stromnes* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff's complaint in her action against defendant corporation contains seven different causes of action. The first three were assigned to her by William Getman; the other four are on accounts assigned to her by her husband, A. W. Stephenson.

In her first cause of action plaintiff alleged that Getman "advanced to the defendant at its special instance and request the sum of $475, for gas and oil." In the second cause of action it is alleged that Getman "advanced to the defendant at its special instance and request the sum of $84.50, for coal." By the third cause of action it is alleged that Getman "advanced to the defendant at its special instance and request

the sum of $68.76, for repairs on plane." In the fourth cause of action it is alleged that Stephenson, plaintiff's assignor, "advanced to the defendant at its special instance and request the sum of $600, to pay mortgage on hangar." By the fifth cause of action it is alleged that Stephenson "advanced to the defendant at its special instance and request the sum of $148.35, to pay taxes." For the sixth cause of action it is alleged that Stephenson "advanced to the defendant at its special instance and request the sum of $292.52, for repairs on plane." And for the seventh and last cause of action that Stephenson "performed work, labor and services for defendant as an aviator at the agreed price of $5 per hour for flying time, and that the services are reasonably worth the sum of $234.75." In addition to the foregoing allegations in each cause of action, the corporate existence of the defendant, the nonpayment of each claim, demand therefor, and the assignment of each claim by the respective assignors to the plaintiff are alleged.

Defendant, as to each cause of action, admitted its corporate existence, and denied generally all of plaintiff's other allegations. It affirmatively alleged, by way of set-off as against the first three causes of action of plaintiff, that Getman, the assignor thereof, became indebted to the defendant for services rendered at his special instance and request, and for gas and oil furnished. By way of set-off, it further alleged that during the time specified in the complaint wherein plaintiff alleged that the defendant became indebted to her assignor, Stephenson, the latter collected money belonging to defendant and converted it to his own use in the sum of $19,980.81.

After the filing of defendant's answer, demand was made for a bill of particulars, which was furnished, and by order of court additional bills of particulars were furnished, and thereafter plaintiff by reply denied the affirmative allegations of the answer.

Thereafter the trial judge, acting on the stipulation of the parties, in open court appointed W. P. Costello, Esquire, referee in the action, "to try any and all the issues in said

case, whether of fact or law, and report a finding and judgment thereon." Thereupon the parties to the action submitted their evidence, both oral and documentary, to the referee. In view of the fact that it will be necessary to discuss the evidence somewhat at length later in the opinion in disposing of the various specifications of error, we will not attempt at this point to include a *résumé* of the evidence, except to make brief reference to some portion of it which it will not be necessary hereafter to repeat.

The defendant corporation was orgainzed in 1929. Stephenson, one of the assignors of plaintiff, was from the date of its organization until February 13, 1931, the president of the corporation, and during such time he was its managing officer. The corporation completed the erection of a hangar at the municipal airport at Great Falls during the year 1929. The capital of the corporation paid in in cash was insufficient to pay the cost of construction of the hangar. Most of the stockholders, and in fact all who contributed cash to the capital, were members of the board of directors.

The referee, after the trial of the case before him, made elaborate special findings, by which it was determined that the defendant was indebted to the plaintiff on all of the causes of action in the amounts claimed; that defendant failed to sustain the set-offs or counterclaims as against the first three causes of action, and sustained the counterclaim as to the remaining four causes of action as to the sum of $156 only. Other findings were made, some of which we will presently notice so far as they are material to the solution of the questions at hand. Conclusions of law were made in accordance with the findings. Judgment was entered in accordance with the findings of fact and conclusions of law. The appeal is from this judgment.

At the close of plaintiff's case defendant made a motion for nonsuit on the ground that there was a failure of proof as to all causes of action, and "a fatal variance between the proof and the pleadings." The referee's ruling denying the motion is assigned as error.

The only variance, if any, that may be found in the record between the pleadings and proof is well illustrated by plaintiff's first cause of action. Getman testified as a witness on behalf of plaintiff that during the time alleged he was employed as a driver for Clack & Co., which was engaged in the business of selling oil and gasoline; that during that time the credit of the defendant with his employer was bad, and he was not permitted to deliver gasoline to defendant upon credit; it was testified to by other witnesses that the defendant corporation was without funds to pay for gasoline ordered, and at various times Getman, and at other times another employee of the Clack Company, delivered gasoline to the defendant for which he, Getman, either paid the amount of the bill to his employer or had it charged to his account. The allegation in the complaint was that he had advanced cash for gasoline. It may be that, strictly speaking, under his testimony as to the method in which these various transactions were handled, he sold and delivered gasoline to the defendant. The variance, if any, was of slight consequence. The defendant does not, and could not, assert that it was misled thereby. The variance was immaterial, and therefore the referee could find the fact in accordance with the evidence. (*Kakos* v. *Byram,* 88 Mont. 309, 292 Pac. 909; *Rhule* v. *Thrasher,* 88 Mont. 468, 295 Pac. 266.) The motion for nonsuit was properly denied.

Defendant assigns numerous specifications of error challenging the correctness of the referee's findings as to the indebtedness owing to the plaintiff, and in denying recovery on its set-offs and counterclaims. Defendant concedes the rule that the findings of the trial court in an equity case will not be disturbed unless the evidence clearly preponderates against them, and cites the case of *Fousek* v. *DeForest,* 90 Mont. 448, 4 Pac. (2d) 472, and many cases of like import. It then argues that the evidence preponderates against the findings of the referee.

The rule announced in the above and similar cases is applicable in cases tried by the court without a jury. All of the

causes of action here involved were brought to recover upon various balances alleged to be due on accounts. The same is true with reference to defendant's set-offs or counterclaims. The action was tried as one at law. Defendant's motion for nonsuit, a proper practice in actions at law, has no application in suits in equity. (*Le Vasseur* v. *Roullman,* 93 Mont. 552, 20 Pac. (2d) 250; *School District* v. *Richards,* 62 Mont. 141, 205 Pac. 206; *Stevens* v. *Trafton,* 36 Mont. 520, 93 Pac. 810.) Furthermore, on the appeal to this court, the testimony in the bill of exceptions is in narrative form. Subdivision 3 of Rule VII of this court provides that in equity cases and cases of an equitable nature the testimony shall be presented in question and answer form. The reason for this rule was treated at length by this court in *Koopman* v. *Mansolf,* 51 Mont. 48, 149 Pac. 491. It was there said that the purpose of this rule was to enable the reviewing court to perform the duty imposed upon it in equity cases by section 8805, Revised Codes 1921, namely, to review all questions of fact arising upon the evidence presented in the record in such cases. Where this rule is violated in equity cases, or in cases such as this, we are obliged to place greater reliance upon the trial court's findings than would otherwise be necessary, and under such circumstances we cannot say that the evidence preponderates against the findings, and therefore they will not be disturbed. (*First National Bank* v. *Robke,* 72 Mont. 527, 235 Pac. 327.)

The findings of a referee are not absolutely conclusive, but they are to be given the same dignity as a special verdict of the jury. (*In re McCue,* 80 Mont. 537, 261 Pac. 341.) The test to be applied in order to determine the sufficiency of the evidence to support the verdict of a jury was stated by this court in the case of *Wallace* v. *Wallace,* 85 Mont. 492, 279 Pac. 374, 377, 66 A. L. R. 587, as follows: "It follows that wherever there is a conflict in the evidence this court may only review the testimony for the purpose of determining whether or not there is any substantial evidence in the record to support the verdict of the jury, and must accept the evidence there found as true, unless that evidence is so in-

herently impossible or improbable as not to be entitled to belief; and, where a verdict is based upon substantial evidence which, from any point of view, could have been accepted by the jury as credible, it is binding upon this court, although it may appear inherently weak. (*Williams* v. *Thomas,* 58 Mont. 576, 194 Pac. 500.) Where the evidence is conflicting, but substantial evidence appears in the record to support the judgment, the judgment will not be disturbed on appeal.'' However, where there are inherent improbabilities in the evidence upon which the case must rest, so patent that the truth cannot be in it, it is a question of law and not of fact. (*Whitney* v. *Bertoglio Merc. Co.,* 65 Mont. 358, 211 Pac. 323; *Casey* v. *Northern Pacific Ry. Co.,* 60 Mont. 56, 198 Pac. 141.) We will, therefore, proceed to examine the evidence in the light of these rules to determine whether or not there is any substantial evidence to support the findings of the referee.

With reference to the first cause of action, Getman testified that when he made deliveries of gasoline to the defendant, commencing in 1930, ''once in a while I could get money from Mr. Stephenson for gasoline on deliveries, but if he was not here I would have to pay for the gas myself or charge it to myself, because the company would not accept charges to the Rainbow Flying Service, and in order to keep the ball rolling I would deliver some gasoline and charge it to myself or else pay for it. This situation first arose about in January or February, 1930, is when they cut off their credit. The H. Earl Clack Company cut off the credit of the Rainbow Flying Service.'' He identified a number of invoices on forms of Clack & Co., all of which, he testified, were in his own handwriting and represented deliveries of gasoline made by him to the defendant ''and paid for by me.''

The witness Johnson identified some similar invoices, three in number, which Getman signed as having received payment. Johnson said with reference to these invoices: ''I had orders to deliver to the Rainbow Flying Service and charge to Bill Getman those deliveries for gas represented in those exhibits.''

On behalf of the defendant a witness was produced, who was the bookkeeper for Clack & Co., Getman's employer. He produced Getman's account which did not show charges to Getman for nearly all of these deliveries; but this witness testified with reference to the matter as follows: "We would not have a record of it if Getman paid for it at the time the gas was delivered." Getman's testimony was to the effect that part of these deliveries were paid for in cash by him, and others were charged to his account. How many of the deliveries fell into each class, the record does not show.

Getman testified as to the second cause of action, that the defendant needed coal to heat the hangar, and that Mr. Zunchich owed "me some money and he wanted to pay it in coal; * * * so he delivered $84 worth of coal up there and I credited him on my account for the coal that was delivered and used up there at the Rainbow Flying Station. * * * Mr. Stephenson, who is here, authorized me to do this. I know that the coal was delivered. * * * The understanding I had with Mr. Stephenson with reference to defendant being obligated to me in this amount was * * * , Mr. Stephenson said the Rainbow Flying Service would pay for it, would reimburse me." Mr. Zunchich testified that he was indebted to Getman in excess of $84.50, and that Getman "instructed me to deliver the coal up at the airport, and I did so."

It was testified that a plane belonging to Getman, which was being used by the defendant for the instruction of student flyers, was injured, and by the agreement under which the plane was being used, defendant was obligated to make the necessary repairs. Getman testified that after the repair parts were received at the express office, "I paid for it because there was nobody else to pay for it." Stephenson "told me to go to the express office and get it, and I went and got it. * * * It was for my ship that these repairs were ordered. It was necessary for the defendant company to order repairs for my plane, because they were using it and were to furnish the parts that were needed. They were using it under an agreement with me, and that was a part of the terms of the agree-

ment with me.'' He also produced and identified the paid express receipt for the amount of these repairs.

As to the fourth cause of action, it appeared that after the defendant's hangar was built it was unable to pay the cost of its construction and a lien was filed thereon for the balance. Stephenson, plaintiff's assignor, negotiated a loan from a finance company with which to pay this indebtedness. He was then employed as a pilot for the National Park Airways, and assigned $200 per month out of his salary to be paid on the indebtedness. He testified that under this assignment, $1,600 was paid on the indebtedness of the defendant, for which he received stock in the corporation for $1,000, and that the balance of $600 was due, owing, and unpaid to him at the time he assigned his claim to the plaintiff. He testified further that on February 10, 1931, he gave his check to the treasurer of Cascade county in the sum of $148.35 for taxes owing by the defendant. He produced the check, which was paid by the bank upon which drawn, on the day after its date. He said, ''The taxes were due in December or the last of November. There was a penalty attached and the hangar is listed as personal property, and the treasurer wanted his money. We debated ways and means of raising the money to pay it. By 'we' I mean—Mr. Houtari [one of the directors], was quite interested in that and worked with me on it, and Mr. Holloway [another director], in fact we all discussed it because it was an urgent indebtedness. There was an understanding had by me with the directors that this payment be made and I made the payment pursuant to that understanding.''

As to the sixth cause of action, Stephenson testified that the airways company had in their possession a plane belonging to the Anaconda Air Service Company, used by the defendant, which was cracked up while in use by one of the defendant company's pilots, who was also a director; that under the agreement between the defendant and the owner of this plane, defendant was obliged to make the necessary repairs. He produced three canceled checks in evidence, of the amounts paid

by him to one Ed Jarmel on account of the repairs of this plane, and an express receipt for $34.08. These four exhibits total the amount of $284.08. The witness testified as follows with reference to the payment of these items: "I paid $284.08 out of my own funds repairing this particular ship"; that he, Mr. Houtari and Mr. Holloway went to see Mr. Jarmel, the mechanic who made the repairs; "we decided to have Mr. Jarmel make the repair on this ship. As to who was to pay for it, that was understood." Again he testified with reference to discussing the repairs with the above-named directors: "I discussed repairs of this job and my reimbursement for moneys advanced by me, with the only officers there were, and the only officers that transacted any business for the defendant. They expected to repay me and that was discussed between me and Mr. Holloway and the rest of them. I had charge of the funds of the Rainbow Flying Service at this time. The Rainbow Flying Service had no funds for this bill at that time."

Stephenson testified as to the seventh cause of action relating to the arrangement he had for such flying as he did for the defendant, as follows: Under the arrangement he was to receive "no base pay, but $5 an hour for flying time. For every hour in the air flying a company ship or for the company is meant flying time on company business, either cross-country flight or instructing students. The total of these hours I put in for the defendant, hours of flying time * * * was approximately from 45 to 47 hours; * * * the amount set forth in the complaint, in the assigned account, $234.75 is correct."

Testimony was offered in support of each cause of action, ▮ that the defendant had not paid any of the sums sued for, and that the accounts had been assigned by the respective owners to the plaintiff. Certain books of the corporation were offered and received in evidence, over defendant's objection. However, no error is assigned on these rulings. The books referred to were the day book, journal and ledger. They were kept by Stephenson, or his wife, the plaintiff here, under his

direction. Testimony was given to the effect that the "entries made therein by his wife and myself were correctly made." Defendant argues extensively in its brief that its counterclaims or set-offs are amply sustained by these books; that because of the fact that Stephenson was the president and managing officer of the corporation he was duty bound to account, by clear and convincing evidence, for its funds which he had handled; that he failed to sustain this burden; and that, therefore, its counterclaims should be sustained as to the various items set forth in the brief.

The books just referred to, prior to the trial and after Mr. Stephenson had severed his connection with the defendant, were submitted to a Mr. Wilson, who was in the employ of Douglas Wilson & Co., a firm of certified public accountants. It seems that Mr. Wilson, who testified and who made an audit of the books, was not himself a certified public accountant, and the audit is not so certified. His report was before the referee and was referred to by various witnesses. He said of these books: "They are not kept as a C. P. A. would keep them; they are kept in accordance with ordinary bookkeeping. If we considered the information contained in the day book, from which this audit was taken, and made from my work sheets, wrong, or any false statements therein, they would not be entered. Everything in here is true so far as I know; I took it from the books and Mr. Stephenson's statement. I don't know of any statement he made to me that is false." The books contain many entries, but they do not reflect any of these accounts, the subject matter of this suit.

It has been suggested that the books of account are the best evidence of the transactions of the corporation. In the case of *Flint Creek Lodge No. 11* v. *Brown,* 81 Mont. 573, 264 Pac. 394, 395, we said: "The next specification is that the court erred in permitting the witness to give oral testimony as to the amount due, as the books of the lodge were the best evidence. No error was committed, since it appears from the record that the books did not show the amount due, as debit charges were not entered therein."

In Jones' Commentaries on Evidence, second edition, page 1423, it is written: "Indeed, books of account have always been regarded as a species of secondary evidence, admissible in favor of the party keeping them because of the necessities of the case, not because they are the best evidence of the transactions recorded in them. The fact that certain entries have been made has never been held to preclude the testimony of a person having knowledge of the facts, and able to testify to them from memory." As to the weight of books of account as evidence, it is said by the same author, at page 3332: "It is for the jury to determine the value of the books as evidence from the appearance of the entries, the manner of bookkeeping, the general correctness of the charges, and all the innumerable and varying circumstances called into existence by the character of the entry and the nature of the particular transaction in question." (See, also, *Radtke* v. *Taylor,* 105 Or. 559, 210 Pac. 863, 27 A. L. R. 1423.)

As already noted, it is contended by defendant that, since Stephenson was dealing with a corporation, the burden was cast upon him at once to show that his dealings had been fair and honest, which is substantially what this court has said in a number of cases, among which may be noted *Hanson Sheep Co.* v. *Farmers' & Traders' State Bank,* 53 Mont. 324, 163 Pac. 1151, and upon which, among others, defendant relies.

In the case of *Mayger* v. *St. Louis Min. Co.,* 68 Mont. 492, 219 Pac. 1102, 1104, this court, in discussing this question, said: "To overcome plaintiff's case, defendant's counsel seem to take the position that, as plaintiff was a director and officer of the company when as administratrix she dealt with the company, a presumption of bad faith on her part attaches. This is based upon the principle that a director, a trustee, occupying a fiduciary relation to the stockholders as he does, may not enrich himself at their expense. He bears the obligation of serving his trust with fidelity and is forbidden to do any act by which the assets of the corporation are diverted from their proper channels. And when a director 'has been dealing with the corporation, the burden is at once upon him

to show that his dealings have been fair and honest.' Such is the language of this court in *Hanson Sheep Co.* v. *Farmers' & Traders' State Bank*, 53 Mont. 324, 163 Pac. 1151, citing *Gerry* v. *Bismarck Bank*, 19 Mont. 191, 47 Pac. 810; *McConnell* v. *Combination M. & M. Co.*, 31 Mont. 563, 79 Pac. 248; *Coombs* v. *Barker*, 31 Mont. 526, 79 Pac. 1; *Kleinschmidt* v. *American Min. Co.*, 49 Mont. 7, 139 Pac. 785. But this does not carry the implication that one may not demand payment of an honest debt due him from a corporation of which he is a director. Nor is there any implication that one who deals with a corporation of which he is a director deals in bad faith —unless he gains an advantage thereby. We are mindful of the rules declared by sections 7888 and 7889, Revised Codes 1921, wherein it is laid down that 'a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind,' and that a trustee 'may not use or deal with the trust company for his own benefit.' There is nothing in the record to indicate that there was the slightest misrepresentation, concealment, threat, or adverse pressure on the part of the plaintiff; neither any dealing with trust property for her own benefit." The rule thus announced applies to the facts in this case. It was adhered to in the case of *Cabot* v. *Gas Products Co.*, 93 Mont. 497, 19 Pac. (2d) 878.

The record discloses that defendant corporation was at most times without funds. The by-laws contemplated that its funds should be deposited in the bank to its credit. This was done at the outset, but the corporation being in debt, the funds in the bank were attached, and thereafter, Stephenson testified, he kept the funds in his own bank account, whether mingled with others or not is not clear. He testified as to the amount of funds which he received and as to the amount expended by him, and the amount found due to plaintiff was somewhat less than the difference between these two amounts. It does not appear that Stephenson gained any advantage by his dealings with the corporation. That he advanced his own

funds in order to keep the corporation functioning cannot be disputed.

The evidence of the witnesses for plaintiff was not so inherently improbable or unreasonable as to be unbelievable. As a matter of fact, the only conflict, if any, between the testimony of the witnesses has to do with the books, and many of these apparent contradictions could be reasonably explained, but to do so would unnecessarily prolong this opinion. As we view it, there is sufficient evidence in the record, if believed by the referee, as it was believed, to justify his findings in all respects.

Error is assigned upon the admission of certain documentary evidence, which is not argued specifically in the brief, although perhaps covered by the general argument. We have examined these specifications and find them to be without merit.

We find no reversible error in the record. Accordingly, the judgment is affirmed.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, takes no part in the foregoing opinion.

Rehearing denied April 1, 1935.