EULA MAY IVINS, as EXECUTRIX OF THE WILL OF R. L. IVINS, DECEASED AND EULA MAY IVINS, PLAINTIFFS AND RESPONDENTS, *v.* ROBERT F. HARDY AND MARY J. HARDY, HIS WIFE, MILES CITY BANK, A STATE BANKING CORPORATION; AND ARTHUR T. McINTOSH, INDIVIDUALLY AND AS TRUSTEE, DEFENDANTS AND APPELLANTS.

No. 9651.
333 Pac. (2d) 471.
Submitted March 18, 1958. Decided Nov. 21, 1958.
Rehearing Denied Jan. 19, 1959.

Wellington D. Rankin, Arthur P. Acher, Helena, F. F. Haynes, Forsyth, argued orally, for appellant.

Howard A. Johnson, Keith P. Johnson, Butte, Howard A. Johnson, argued orally, for respondent.

MR. JUSTICE CASTLES:

This is the third appeal taken by Robert F. Hardy, defendant and appellant throughout, in the actions brought by R. L. Ivins, plaintiff, and in each appeal the respondent, seeking an accounting from Hardy and a termination of their joint venture in the purchase and the operation of a large ranching property, owned equally by them. From the date the properties were first acquired, Hardy has occupied the ranch buildings and has managed all or a part of the holdings.

The original purchase was made September 20, 1939. Since then the jointly owned deeded lands, with adjoining state grazing leases and federal grazing permits have been substantially expanded, at times by Hardy in his sole name, although the ownership is joint and although the venture has been continuously in litigation since December 20, 1944. Generally

speaking, the decisions in the first two appeals have been for Ivins, the plaintiff and respondent, and against Hardy, the defendant and appellant. But the present is the third appeal, the accounting has still to be made, the properties are still undivided and briefs of counsel assume the end is not yet.

The interest of the plaintiff is now represented by Eula May Ivins, his widow, appearing as his executrix. In the present suit, which continues the demand for money accounting and asks for a decree partitioning and setting over the properties, other parties have been joined with defendant Hardy. But here, as before, Hardy is the principal defendant and principal appellant, and will be treated as such. For convenience, Ivins will be treated as plaintiff and respondent, rather than his executrix, who has been substituted for him.

Upon the first appeal this court affirmed the trial court's decision that the enterprise for the acquisition and operation of the L O Ranch and other ranch properties was a joint venture. The lower court's order requiring an accounting by Hardy and ordering a sale of the ranch personal property was sustained, but its order for the sale of the real property was reversed. Ivins v. Hardy, 120 Mont. 35, 179 Pac. (2d) 745, decided April 15, 1947.

The second appeal was taken from the trial court's judgment on the accounting ordered in the prior appeal, including a money award to Ivins of $24,000. This court affirmed that judgment on April 3, 1950. Ivins v. Hardy, 123 Mont. 513, 217 Pac. (2d) 204.

The present action was then brought by Ivins for the termination of the tenancy in common in the real property and for an accounting of all monies collected by Hardy, including the value of his use of the lands since January 1, 1948. An amended complaint in this present action was filed in Custer County district court April 17, 1951. The present and third appeal grows out of that complaint. Specifically, the third appeal is from the trial court's interlocutory decree confirm-

ing a referees' report proposing a division of the ranch between the joint owners.

Despite the protracted course of litigation, and the objections which were made by counsel in advance of the hearing, "just for the record," it must be borne in mind that the interlocutory decree here appealed was entered pursuant to a stipulation between counsel for all parties which, among other things, provides:

"That all of the above lands, permits and leases are owned and held by the plaintiff, R. L. Ivins, and by the defendant, Robert F. Hardy, as tenants in common each owning an undivided one-half interest therein.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the said lands are so situated that the same can be partitioned and divided between the respective co-owners and that a partition thereof, according to the respective rights of the co-owners, is hereby ordered, and for that purpose a Board of three referees shall be appointed by the Court to make such partition and division."

Likewise, it must also be borne in mind that the decree here appealed was entered pursuant to a further stipulation between counsel for all parties that the decree in part above-quoted should be amended as follows:

"That whereas said Interlocutory Decree directs the commissioners on partition to partition and divide the parties' lands described as the lands held under Taylor Grazing Permits, that said provision be annulled and the following substituted therefore: 'The Commissioners are advised that lands held under Taylor Grazing Permits are not subject to partition and division as such, but the Commissioners are entitled *to give such consideration to said lands as being adjoining or adjunct to lands held in fee by either party* as they may decide *said lands will contribute, if anything, to the value of the lands held in fee* which are subject for division, *or that are leased* for a term of years.'" Emphasis added.

The foregoing, by stipulation of all counsel, are the basic

instructions on which the referees were directed to bring in a report for approval or disapproval by the district court. These stipulations recognize that the properties in dispute could be divided in kind. They also recognize that the value of the deeded lands and the increase in their value by the leases on the adjoining state grazing lands was further increased by the value of the permits on the Taylor Grazing Act (43 U.S.C.A. section 315 et seq.) lands within the public domain but adjoining the lands jointly owned by the parties and the state lands on which they jointly owned grazing leases.

On March 30, 1955, two of the referees, Simpson and Allen, filed a report allocating certain lands to the plaintiff, and other lands to the defendant. On April 4, 1955, the third referee, Mitchell, filed a separate report recommending a different division of the lands. On June 15, 1955, referees Simpson and Allen filed a supplemental statement explaining in detail the basis for their recommended partition. Subsequently, on December 12, 1955, the court entered its interlocutory decree approving this report. It is from this decree that the present appeal is taken.

The supplemental statement to the referees' report contained the following explanation:

"The animal units for a ten month period on the sections above mentioned with the asterisk * [certain hay lands] were arrived at according to the number of tons of hay per acre as we estimated would be produced in an average year over a period of time. The average winter feeding period in this area being about 2 months we calculated the animal units for 60 days and translated it into 10 month period, reason being to simplify our report. Figuring the average weight of a cow, calf and yearling as being 700 lbs. and that it required 2% of an animal's weight to sustain such weight for a period of sixty days, thus giving the complete operation for one year.

"It is our judgment that natural hay land would produce 1 ton per acre, therefore, it would require 2 acres of natural hay land to carry one animal ten months. We further calcu-

lated and allowed three acres per animal unit on developed hay land and four acres of potential hay land."

The referees' report was confirmed and adopted by the district court after hearing testimony of all appraisers and of numerous witnesses for the contending parties whose testimony shows honest difference of opinion but complete familiarity with the lands and with livestock operations in the area. The testimony and cross examinations reveal that all appraisers are men of integrity and experience, eminently qualified for the extremely difficult task they accepted under the stipulations of all parties and that the report the district court confirmed was made using "the formula as set up in Extension Circular 204, revised by 1949 State Land Reclassification for Taxation Purposes in Montana by the Extension Service of Montana State College" in an attempt to "set up a partition that would divide the ranch into two balanced units for a twelve-month carrying on of operations." Asked "What was that break-down? Explain it to the court?" one of the referees testified:

"A. Well, if it was strictly a grazing section, it was listed as a grazing section with the mark of the code [detailed code devised by the appraisers for their own convenience under the state Extension Service formula] that I was following on the township and, consequently, in the report. If it was land with hay meadow or 'potential hay meadow development, it was listed, too, that way on the plats and in the report. The reason for doing this is only arrived at from pracitcal observations. If you attempt to purchase or become the operator of range land, your first consideration is to whether there's a possibility of improving it for increased carrying capacity.

"Q. Now, if I understand you and understand the partition correctly, that was considered upon the animal-carrying-capacity basis? A. Yes, sir.

"Q. Not an acre-to-acre basis? A. No, sir."

The discount of 25 per cent in the estimated carrying capacity values attributed to the leased state lands and the federal permit lands, arising by reason of their non-fee ownership, was

explained by one of the referees in answer to a question asked by the trial judge, as follows:

"Q. * * * will you state to the Court your reasons for arriving at the 75 per cent evaluation? A. Yes, it was from our knowledge of the entire ranch property holdings that, animal unit for animal unit, they practically have the same values—I mean by that the Taylor land and the deeded land, or the State land—but because the operator or owner of the title land doesn't have complete control of the Federal or Taylor land, Judge, or the State land, we discounted that fact 25 per cent and gave 75 per cent of valuation of each animal unit designated on a Taylor permit plan and a State plan as being contiguous to the deeded land involved. * * * I think the first element to consider in the Taylor land is to its, how it is situated or put in within the deeded land and to what assurance the operator may have in continuing to keep his [animal] permit from the [federal] Agency.

The report of the referees concludes with the following summary:

"A recap of the amount of property allotted to each party is as follows:

"To: R. L. Ivins

| | Acreage | Animal Units | % of Value Charged | Net Value |
|---|---|---|---|---|
| Deeded and contracted | 54,352.40 | 1,593.48 | 100% | 1,593.48 |
| Deeded in lieu of interest in LO headquarters | 1,280 | 34 | 100% | 34 |
| Federal | 2,178.24 | 43.72 | 75% | 32.81 |
| State | 3,200 | 80 | 75% | 60 |
| | | Total | | 1,720.29 |

To: Robert F. Hardy

| | Acreage | Animal Units | % of Value Charged | Net Value |
|---|---|---|---|---|
| Deeded and contract | 51,730.57 | 1,370.19 | 100% | 1,370.19 |
| Federal | 12,712.01 | 233.13 | 75% | 174.85 |

452

State 5,415.76 142. 75% 106.50.

Total.....................1,651.54"

Speaking in round numbers, the report confirmed by the district court gives Ivins 55,600 deeded acres and 5,000 acres of state leases and federal permits. It gives Hardy 51,700 deeded acres, the headquarters buildings, and 18,000 acres of leases and permits. The differential is the relative estimated carrying capacity and the award to Hardy of $20,800 value in headquarters buildings and improvements. It should be added that the area awarded Hardy includes the same area he had taken and long occupied exclusively for himself.

The over-all area is better than 200 square miles of hay meadow and range pasture. In the language of the Powder River Country, the old "LO" is now a "3,500 cow spread." It is worth a million dollars. But to a livestock operator, a ranch is what it will produce. Reconciled in over-all carrying capacity and including allowance for headquarters values allowed to Hardy, the net difference between the total award to Ivins and the total award to Hardy, when translated into animal units, is three quarters of one cow.

In passing, we should note that the present appeal involves no mineral titles. By stipulation, each of the parties reserved an undivided one-half interest in these. Also we should note that respondent's motion to dismiss this appeal on the ground that an interlocutory order is not appealable was abandoned during the argument. This motion, therefore, requires no discussion in this opinion, as do the abandoned objections to the report and supplement made prior to hearing in the district court. See In re Murphy's Estate, 43 Mont. 353, 116 Pac. 1004, Ann. Cas. 1912C, 380; City of Philipsburg v. Weinstein, 21 Mont. 146, 53 Pac. 272.

In the interlocutory order here appealed, the trial court found that the report "as filed by the referees, C. M. Allen and Milton Simpson, together with their supplemental statement, is supported by the testimony adduced at said hearing and that the

partition and allotment of the several portions as set forth therein, considering the quality and quantity, is a fair and equitable division thereof." The trial court also found that the different division recommended by the third referee, W. A. Mitchell, was not sufficiently supported by the evidence and testimony.

What evidence of land values, if any, the referees received is not shown; but the record does show that no evidence of land values was offered by appellant at the hearing in which appellant objected to respondent's motion to adopt the referees' report. The record shows that the referees examined the property, "each making his own notes and estimates of the production of said lands." The property involved is a stock ranch. The referees valued it in carrying capacity or "animal units," treating the entire holdings as a single livestock ranching operation. As instructed by agreement of the litigants in the supplemental stipulation, they assigned to the deeded lands and to the lands under state grazing leases, additional value by reason of federal grazing permits issued in the joint names of Ivins and Hardy on federal (Taylor Grazing Act) lands "adjoining or adjunct" the deeded and the state leased lands.

Neither party questions that the values of the deeded properties and of the leased state grazing lands are enhanced by the values contributed to them by the "adjoining or adjunct" federal grazing range. That contiguous federal range increases the value of deeded base holdings is elementary to the economy of western livestock ranching. The principal dispute is over the values assigned, state grazing leases being renewable but at going prices at time of renewal, and Taylor Grazing Act privileges on the public domain being annual seasonal permits but with no preference rights except those accorded by federal administrative regulations and being withdrawable at any time without payment of compensation.

Against the argument that this impermanence of renewal price on state lands and this uncertainty of any renewal of public domain permits materially discounts the values of such grazing to the adjoining base landowner, respondent asserts

454

that in practical experience the federal permits are taken as permanently renewable in the permittee who controls the adjacent base properties. This assertion was substantiated in the district court by competent evidence, but appellant replies that a revocable annual permit is still no right.

Query, then, is the proposed division just or is it unjust, and was it confirmed by the district court in error or in sound discretion? That the report was made under stipulations to which both sides agreed is undisputable, and that the report of referees is to be rejected only for reasons which justify the reversal of a jury's verdict is settled law. Ivins v. Hardy, 123 Mont. 513, 217 Pac. (2d) 204.

That the report confirmed by the trial court is objectionable as a "majority report" was not seriously urged on appeal. The report the court confirmed is *the report*. A "minority report" of referees is as great an anomaly and as little consolation as a "minority verdict" of a jury.

As was stated for the full court in the opinion on the last prior appeal, Ivins v. Hardy, 123 Mont. 513, supra at 518, 217 Pac. (2d) 204, at page 207:

"Appellant questions the right of Ivins to a money judgment as allowed by the trial court [$24,009.72].

"The rule is that a report or findings of a referee when approved and adopted by the trial judge 'will be treated as unassailable if there is any substantial evidence to sustain them.' In re Lunke, 56 Mont. 226, 182 Pac. 126, 127; In re McCue, 80 Mont. 537, 261 Pac. 341. See also, Stephenson v. Rainbow Flying Service, Inc., 99 Mont. 241, 42 Pac. (2d) 735.

"As shown by the transcript and as found by the trial court, there was substantial evidence to support the referees' findings. In fact there was evidence, had the referees desired to follow it, which would have justified a much larger money judgment in Ivins' favor."

The appellant urges seven specifications of error, all di- rected to the proposition that the referees followed a prejudicially erroneous rule in concluding that the lands held

by the parties under lease from the State of Montana or under permit from the federal government in the public domain were of a value to the one to whom such lands were awarded equivalent to 75 per cent of the value of lands owned in fee. As put by appellants:

"Nearly fifty-eight Thousand Dollars [$57,793.24] (using the referees' yardstick of animal units, converted into value in dollars using their value per animal unit) *which Ivins gets in deeded land,* Hardy gets only in revocable grazing privileges, for the continued enjoyment of which he must in addition pay rental for the use of the lands."

As shown above, the referees fixed a carrying capacity for each tract of land in animal units. Except with reference to the headquarters improvements, this method was the sole method used throughout the division. It must be remembered that the property is jointly owned.

The referees valued the headquarters improvements at $20,800, allotted them to Hardy, and found Ivins' half of this to be the equivalent value of 34 animal units. Thus, in this one instance, the referees' report ascribes a value of $305.88 to an animal unit. Two sections of land, 1,280 acres, were allotted to Ivins in lieu of his one-half interest in the headquarters improvements. But all other carrying capacity calculations are in terms of animal units without reference to dollar values.

The appellant has seized upon this particular figure to justify his assertion that the lower court's order approving a referees' report which allots 55,632.40 acres of deeded land to Ivins as an equivalent of 1,627.48 animal units gives Ivins dollar values of $489,993.58, and further to assert that allotting 51,730.57 acres of deeded land to Hardy as an equivalent of 1,370.19 animal units gives Hardy dollar values of $419,278.14. Thus appellant contends that the division of deeded lands favors Ivins over Hardy by $70,715.44 in dollar values. By the same method of calculation appellant further asserts that the "total [additional] valuation charged against Hardy in excess of that charged against Ivins *on account of State*

*and Federal lands* [is] $57,793.24.'' Emphasis added. In summary, this is an assertion that the referees' report euchres Hardy out of over $128,000 in dollar values. Using appellant's special approach, and taking the referees' figures piecemeal, this would appear at first glance to be the result. However, as we have pointed out, the referees undertook their problem under agreed stipulations and their net final differentiation in the carrying capacity is exactly three quarters of one cow.

If the arbitrary figure of $305.88 per animal unit is applied to the 1,719.54 animal units allowed overall to Hardy plus the 1,720.29 animal units allowed over-all to Ivins, this three quarters of a cow difference comes to $229.41.

To all practical intents and purposes, the dollar values allotted by the referees' report are equal. We come then to a consideration of whether or not the 75 per cent valuation placed on the permit lands as ''adjoining or adjunct'' to the deeded lands and the lands held under state grazing leases is borne out by substantial testimony, and, as a part of this, whether or not the so-called ''potential'' values were erroneously used.

At first blush we might observe that a figure representing the value of permit lands as equal to 75 per cent of the value of deeded lands does not appear equitable. However the record reveals, and we are aware of the fact, that valuation of purely livestock producing ranches (exclusive of mineral values and other commercial values) is based upon what they will produce. The Legislature has recognized the animal unit method of valuation. The state land board is authorized to determine the rental value of state grazing lands on an animal unit basis. R.C.M. 1947, section 81-401.

What is the nature of a referees' report? R.C.M. 1947, section 93-6319, in part provides: ''In making partition the referees must divide the property and allot the several portions thereof to the respective parties, quality and quantity relatively considered, according to the respective rights of the

parties as determined by the court, pursuant to the provisions of this chapter * * *''

R.C.M. 1947, section 93-6321, provides:

''The referees must make a report of their proceedings, specifying therein the manner in which they executed their trust, and describing the property divided, and the shares allotted to each party, with a particular description of each share.''

R.C.M. 1947, section 93-6322, in part provides:

''The court may confirm, change, modify, or set aside the report, and if necessary appoint new referees. Upon the report being confirmed, judgment must be rendered that such partition be effectual forever, which judgment is binding and conclusive: * * *''

In Field v. Leiter, 16 Wyo. 1, 50, 90 Pac. 378, 390, 391, 92 Pac. 622, 125 Am. St. Rep. 997, the Wyoming Court discussed a somewhat similar problem as follows:

''The well-settled rule is that the action of commissioners in partition will not be set aside on the ground of unequal allotments, except in extreme cases—as where the partition appears to have been made upon wrong principles, or where it is shown by very clear and decided preponderance of evidence that the partition is grossly unequal. The report of commissioners in this class of cases is regarded at least as conclusive as a verdict of a jury upon a trial at law, and will not be disturbed except upon grounds similar to those on which a verdict may be vacated and a new trial granted. Indeed, the rule is maintained by some courts that it is to be regarded with more favor than a verdict, for the reason that the commissioners are usually selected by the parties because of their superior judgment and capacity to perform this particular service, and are authorized to exercise their personal knowledge and to act upon a view of the property. Freeman, section 525. In New Jersey it was said: 'Where a partition has been actually made by commissioners, the court, by its well-settled practice. interferes with their action with great reluctance. It is only where a clear mistake has been made that their pro-

ceedings will be interfered with.' Bentley v. Long Dock Co., 14 N.J. Eq. 480.'' See also Ivins v. Hardy, supra, 123 Mont. 513, 217 Pac. (2d) 204; Wilkerson v. Wilkerson, 169 Okl. 232, 36 Pac. (2d) 935, 937; and 40 Am. Jur., Partition, section 81, page 68.

Both parties agree that the report of commissioners is regarded at least as conclusive as a verdict of a jury and should not be disturbed except upon grounds similar to those on which a verdict may be vacated and a new trial granted. The appellant states his view of the issue herein involved as follows:

''The Referees failed to follow the statutory direction which had been given to them to divide the property and allot the several portions, quality and quantity relatively considered. They apparently assumed that they must make a division line, with one person's land on one side of the line and the other person's land on the other side of the line. This we submit is not the law. The fee lands could have been divided. Perhaps it was more convenient to give to each man contiguous lands, but apparently that could not be done, quantity and quality relatively considered. The Referees ignored the Order of the Court and the statute.

''We have cited decision of this Court * * * to the effect that if a jury disregards a specific instruction, a new trial should be granted.

''Our whole case is based on the contention that the Referees ignored the statute, ignored the Order of the Court, and endeavored to divide the ranch into two parts, treating the Taylor Grazing Lands as if they were owned in fee.''

As previously related, the interlocutory order was amended by stipulation and agreement. If the referees followed the instructions contained in the stipulated order, the appellants cannot be heard to complain. We have previously quoted the pertinent portion of their instructions.

We cannot hold that the report of the referees makes any division of either the state grazing lands or of the federal lands under grazing permit. The stipulated instructions did

not so allow, and there was no land ownership in either party to be divided. The report of the referees clearly shows an attempt to apportion equitably the advantages the grazing on these lands contributed to the jointly owned deeded base holdings, as the instructions stipulate. The record indicates that from the time Hardy occupied the ranch premises he resided in the headquarters buildings, which are on the northerly side of the premises, and that for a considerable time Hardy has used the northerly portion of the ranch and Ivins has used the southerly portion. The referees' division of the deeded lands worked out to follow the division of the ranch already tacitly observed by the parties. In consequence, each party was allotted state grazing leases and federal grazing permits on lands adjoining or adjunct to the base lands allotted to him. Any other allocation would have been unrealistic, and it would have nullified or tended to nullify the values the leases and permits contribute because federal grazing permits are issued with reference to the permittee's base holdings. As one of appellant's own witnesses testified:

"It [a Taylor Grazing Act permit] is allocated this way. If I have, for instance, a section sitting here, this man borders here, I border it on two sides, I get it. If he borders it on two sides, he gets it." Additionally, the record shows that much of the state leased land and the federal permit land is not only adjoining or adjunct to the deeded land, it lies within it.

Appellant objects that the referees based their report in part on "potential valuations" and argue that some of the hay lands were treated as "in production." Examination of the referees' report does not sustain the objection. The report shows calculations were made on these, among other figures:

| | |
|---|---|
| Developed hay land | 3 acres per animal unit |
| Dry farm land | 5 acres per animal unit |
| No. 3B grazing land | 37 acres per animal unit |
| No. 3 grazing land | 30 acres per animal unit |

460

No. 4 grazing land 40 acres per animal unit

Natural hay land 2 acres per animal unit

"30 acres potential hay land at 4 a [acres] per A [animal] U [unit]"

Potential is a prospect; production is a fact. But here taking the potential as a fact, and as pointed out by respondent, the point in dispute involves a difference of only 3 per cent of the 3,496.52 animal units involved in the computation.

This contention, that potential values and the 75 per cent valuation in the grazing lands as adjunct to the deeded lands, is grossly unequal and made on wrong principles may not be accepted in the absence of some strong showing of gross inequality or use of wrong principles. We find difference of opinion but no showing in the testimony such as would warrant our reversing the order of the district court which adopted and confirmed the referees' report.

Appellant stresses the federal condemnation case of United States v. Jaramillo, 10 Cir., 1951, 190 F. (2d) 300, 302, where judgment for a rancher owning, as here, deeded lands with state grazing land and federal grazing permit lands adjoining was reversed. Appellant takes the position that this case is authority for reversing the Custer County district court and for ordering the appointment of new referees. But the error in the Jaramillo case was in the jury's considering the separate value of the permit land within the public domain, which Jaramillo did not own, in reaching a verdict awarding damages in condemnation. The court recognized that grazing permits on the public domain do enhance the value of the adjoining or adjunct base deeded land, stated with approval: "The jury was further instructed, however, that on the date of the taking of the lands, Mr. Jaramillo did have a grazing permit for 48 head of cattle, and that the jury should take that fact into consideration in determining the value of the fee lands and state lease, *giving to the fee land and the leased land such added value as in its judgment should be given on account of the availability and accessibility of the permit land.*" Emphasis supplied. The court's opinion further

states: "In determining the adaptability of the lands as a ranch, it was therefore proper to take into consideration the availability and accessibility of the permit land as an appurtenant element of value for ranching purposes, provided that consideration is also given to the possibility that the permits could be withdrawn or cancelled by the Government at any time without constitutional obligation to pay compensation therefor."

This principle is the principle underlying the 75 percent evaluation and the 25 percent discount over-all equally applied to the parties. The percentages are not what the appellant desires. They may very well be other than this court would adopt if examining the properties originally as referees appointed by a district court. But in the absence of any substantial showing of gross inequality or the use of wrong principles in the referees' report, the confirming order of the district court must stand. On appeal, the report of the referees may not be re-refereed for lesser reasons.

As the Wyoming court observed in Field v. Leiter, 16 Wyo. 1, supra, at page 49, 90 Pac. 378, at page 390, " * * * the commissioners appear to have been men of large experience, long personal acquaintance with most of the lands, and possessing a general knowledge of the character, usefulness, and the value of lands located as these lands are. * * * It is reasonable to suppose, in a matter of this kind and magnitude, that the commissioners were selected because of their experience and knowledge, as well as their reputation for fairness.

"The conflict upon the evidence concerning the values in controversy is so pronounced that there would seem very small ground for assurance that the vacation of the proceedings and another reference to the same or different commissioners would result in harmonizing in any material degree the contrary opinions of those competent to speak upon the subject. The fact is well known that the honest views of equally fair and capable persons will often differ more or less widely regarding the value of real estate."

Following this the Wyoming court recites the rule as to gross inequality or use of wrong principles, which we quoted at the outset of this opinion, and which also appears in the last Ivins v. Hardy appeal, likewise cited, supra.

Our problem is with the equality of the whole partition rather than with the *prima facie* inequality of any of its parts. The presence or the absence of adjoining, adjunct or contiguous lands under state grazing leases and under federal grazing permits is by common knowledge a basic factor in the economy of the livestock raising west. Our legislature has recognized the animal unit basis for calculating value. To ranchers, the value of a livestock producing property is the value of the livestock it will produce.

While counsel for respondent has argued that only two of appellant's objections are now properly before this court, we have nevertheless carefully examined all specifications of error. Justice requires no less.

This joint venture in the ownership of these livestock ranching properties was undertaken by Ivins and Hardy some nineteen years ago. During the last thirteen years the owners have been in litigation. The period for which the present action seeks accounting is now entering its second decade. With the Wyoming court, we must say that "the honest views of equally fair and capable persons will often differ more or less widely regarding the value of real estate." Nevertheless, absent wrong principle, and absent evidence preponderantly showing that the partition is grossly unequal, a report of referees must be confirmed by the district court; whereupon "judgment must be rendered that such partition be effectual forever." R.C.M. 1947, section 93-6322.

For the reasons stated, the interlocutory decree of the district court is affirmed.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICE ADAIR, concur.

MR. JUSTICE ANGSTMAN, Justice, and THE HONOR-

ABLE JACK R. LOUCKS, District Judge, sitting in place of MR. JUSTICE BOTTOMLY (dissenting).

We think the inequality of the majority report of the referees is so pronounced that the trial court ought not to have approved it.

The report awarded 12,712 acres of Federal Taylor Grazing land to defendant and 2,178 acres to plaintiff.

It awarded 54,352 acres of deeded land to plaintiff and 51,730 acres to defendant.

The Federal Taylor grazing lands carry only grazing privileges for which a rental must be paid. These privileges are revocable and dependent for their duration upon the unpredictable action of Congress.

If it were proper to consider the value of the Taylor grazing land, a proposition denied in United States v. Jaramillo, 10 Cir., 190 F. (2d) 300, we cannot believe that they are worth 75 percent of the value of deeded land as a majority of the referees found. One of the referees who filed a minority report evidently disagreed with that procedure. Many witnesses testified on the subject and some placed the valuation as low as 10, 15, 20, 25 and 30 percent instead of 75 percent. One witness for plaintiff placed the value at 50 percent. The entire question of what would be a proper percentage contribution to the value of deeded lands could be eliminated by dividing the land so that each party would receive substantially the same number of acres of deeded land and substantially the same number of acres of Taylor grazing land, reasonable allowances to be made of course for the different character of the land, if any.

It is true that division, giving exact acreage to each party, may not be possible or even desirable. But when the discrepancy in acreage given to each is as great as that here, it lacks the equality of treatment which the law and equity favors.

We think that a more equitable acreage division should be made or if that is not feasible, then resort should be had to section 93-6348, R.C.M. 1947, and equality of treatment be achieved by awarding compensation by one party to the other.

We see nothing in the stipulation that binds defendant to the award here made or to the procedure followed in reaching that award.

THE HONORABLE JACK R. LOUCKS, District Judge (dissenting).

I joined with Mr. Justice Angstman in a dissent, from the majority opinion. I wish to record my dissent from the order denying appellants' petition for a rehearing.

The majority opinion approves a confiscation of property of the appellant Hardy and denies the appellants' rights secured to them under the due process clause of the State Constitution, Const. art. 3, section 27 and the Fourteenth Amendment to the Constitution of the United States.

The affirmance of the interlocutory decree of the district court approves acts of the referees on partition which, in my opinion, were in violation of the Act of Congress of June 28, 1934, (43 U.S.C.A. section 315 et seq.) known as the Taylor Grazing Act and the federal regulations issued pursuant to that Act.

The referees could not lawfully partition the lands held under Taylor Grazing permits and they were so instructed by order of the district court.

Section 3 of the Taylor Grazing Act (43 U.S.C.A. section 315b) provides in part:

"The Secretary of the Interior is authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range, upon the payment annually of reasonable fees. * * * So far as consistent with the purposes and provisions of this chapter, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this chapter shall not create any right, title, interest, or estate in or to the lands."

Regulation 43 C.F.R. 161.7 provides:

"A transfer of a base property, whether by agreement, operation of law, or testamentary disposition, will entitle the transferee, if otherwise properly qualified, to all or to such part of a license or permit as is based on the property transferred, and the original license or permit will be terminated or decreased by such transfer."

The Regulation 43 C.F.R. 161.2 defines the priority period as the 5-year period immediately preceding June 28, 1934, and requires the Federal range to have been used with the base land or water during that period.

The base lands must be commensurate. Thus 43 C.F.R. 161.6 (c) (1) provides:

"No license or permit will be issued to any applicant unless he is able to show that he possesses adequate feed to support his licensed or permitted livestock during the period of time for which they are to be off the Federal range."

The record does not disclose that the fee lands as partitioned by them were the commensurate base lands for the respective federal permit lands which the referees recommended for allotment to the respective parties.

There is nothing in the record that the Federal Grazing lands recommended for allotment to Hardy would be transferred to him alone.

Whether the permit lands could actually be allotted as the referees recommended under the federal statute and regulations is a matter entirely beyond the control of the referees.

The referees should not be permitted to assume that will be done which they were forbidden to do. That is, they may not appraise the permit lands upon the animal unit basis, recommend the allotment of the permit lands, and then arbitrarily add 75 percent of the value of the permit lands recommended for allotment to one of the parties to the estimated value of adjoining fee lands allotted to that party when they cannot lawfully partition the permit lands.

In arbitrarily adding to the value of fee lands a separate

466

and independent value of permit lands, the referees adopted an illegal method of evaluation condemned in many cases where questions of value were involved. United States v. Jaramillo, 10 Cir., 1951, 190 F. (2d) 300; United States v. Meyer, 7 Cir., 1940, 113 F. (2d) 387; Morton Butler Timber Co. v. United States, 6 Cir., 1937, 91 F. (2d) 884; Atlanta Terra Cotta Co. v. Georgia Ry. & Electric Co., 132 Ga. 537, 64 S.E. 563.

Plaintiff Ivins and defendant Hardy each admittedly owned an undivided one-half interest in 107,362.97 acres of deeded land. They likewise had equal rights to revocable grazing privileges on 14,890.25 acres under permit from the Federal Government. The referees recommended that the permit lands be allotted 2,178.24 acres to Ivins and 12,712.01 acres to Hardy. Thus Hardy was charged with a dollar valuation of $43,464.24 on account of federal permit lands recommended for allotment to Hardy in excess of the permit lands recommended for allotment to Ivins. Hardy's share of deeded land is thus proportionately decreased and Irvin's share is increased.

To give to these revocable grazing privileges a value equivalent to 75 percent of the value of lands of equal carrying capacity owned in fee and then to allot six times as much of this permit land to Hardy as is allotted to Ivins, effects a confiscation of property of Hardy without due process of law.

Due process of law means more than "due procedure." As the United States Supreme Court said in State of Washington ex rel. Oregon R. & Nav. Co. v. Fairchild, 224 U.S. 510, 524, 32 S. Ct. 535, 538, 56 L. Ed. 863, 868:

"For the guaranty of the Constitution extends to the protection of fundamental rights,—to the substance of the order as well as to the notice and hearing which precede it. 'The mere form of the proceeding instituted against the owner, even if he be admitted to defend, cannot convert the process used into due process of law, if the necessary result be to deprive him of his property without compensation'."

MR. JUSTICE ANGSTMAN. (concurring).

Having disagreed with the majority opinion filed herein, I concur in the result stated by Judge Loucks in expressing disapproval of the order denying appellants' petition for rehearing.